[No. S004639. Crim. No. 23874. June 26, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT M. BLOOM, JR., Defendant and Appellant.

[Crim. No. 25325. June 26, 1989.]

In re ROBERT M. BLOOM, JR., on Habeas Corpus.

COUNSEL

Dennis P. Riordan, under appointment by the Supreme Court, and James S. Donnelly for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert R. Anderson, Thomas L. Wilhite, Jr., and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUFMAN, J.—Defendant Robert M. Bloom, Jr., appeals from a judgment imposing the death penalty following his conviction of three counts of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), accompanied by multiple-murder special-circumstance findings (§ 190.2, subd. (a)(3)) and firearm-use findings (§ 12022.5) as to each count. Additionally, as to one count, the jury found

that defendant personally used a dangerous weapon (scissors) to murder his victim. (§ 12022, former subd. (b) [now subd. (d)].) Defendant also has filed a related habeas corpus petition supplementing one of his appeal contentions. As will appear, we conclude that the judgment should be affirmed in its entirety, and the petition for writ of habeas corpus denied.

## I. INTRODUCTION

Defendant was charged with murdering his father (Bloom, Sr.), stepmother (Mrs. Bloom) and eight-year-old stepsister (Sandra). Defendant, who was 18 years old when these offenses were committed, pleaded not guilty and, as to the murder of Sandra only, not guilty by reason of insanity. After the jury returned guilty verdicts on each count, defendant withdrew his insanity plea and moved to represent himself, with his attorney remaining in the case to advise and assist him. The court granted this motion. At the conclusion of the penalty phase, the jury returned a verdict for imposition of the death penalty.

Following an incident of violence in jail, defendant was relieved of his self-representation status and a hearing was held to determine his competence to cooperate with counsel. After a jury determined he was competent, defendant was again permitted to represent himself for the purpose of participating in the sentence modification proceedings (§ 190.4, subd. (e)). The trial court denied defendant's motion to modify sentence and sentenced him to death. This appeal is automatic. (§ 1239, subd. (b).)

## II. GUILT PHASE FACTS

On April 22, 1982, at approximately 4:15 a.m., police officers found Bloom, Sr., shot to death, lying in the front doorway of his residence. Mrs. Bloom, also dead of gunshot wounds, was found on the floor of one of the bedrooms. Sandra, who had been both shot and stabbed, was found on the floor of another bedroom. The child was alive but in very bad condition. She was taken to a hospital where she died the next day without regaining consciousness. In statements to police and in testimony at trial, defendant admitted killing Bloom, Sr., but claimed he did so only after Bloom, Sr., had killed Mrs. Bloom. Defendant claimed memory loss for the time during which Sandra was killed.

### A. *The Prosecution's Case-in-chief.*

Martin Medrano testified that on or about April 15, 1982, defendant asked Medrano to obtain a gun for him, offering to pay $400 to $500. Defendant said he already had a rifle but he wanted a handgun because it

would be easier to conceal. Defendant said he needed the gun to kill someone, and that Medrano would read about it in the newspaper. Medrano agreed to obtain the gun but never did.

Ricardo Avila testified that he, like defendant, had been Christine Waller's boyfriend. At lunchtime on April 20, 1982, Avila went to defendant's place of employment to tell defendant his father was looking for him. Avila listened as defendant telephoned his father but remembered only defendant's concluding words: "You are running my life now but you won't be for long." At Waller's residence that evening, Avila heard the sound of five shots being fired in succession. The noise seemed to be coming from the back yard and was followed by the sound of the back door sliding. Going to investigate, Avila encountered defendant carrying a rifle partially concealed under his coat. Avila asked defendant what he was doing but defendant just told him to go away. Defendant entered Waller's brother's bedroom. Avila attempted to follow but defendant told him to stay out.

Waller testified that she was with defendant at her residence on the evening of April 20. Defendant went outside after telling her to remain in the house. Looking out a window, she observed defendant carrying a rifle and walking toward a field behind the house. Waller also testified that Bloom, Sr., constantly bullied and berated defendant, and that defendant tried to satisfy Bloom, Sr., but never seemed able to do so.

Raul Rosas testified that he was Waller's brother. In April 1982 he was no longer living at his mother's residence, where Waller lived, but frequently visited there. He had owned a .22-caliber semiautomatic rifle, which he sometimes kept behind a dresser in a bedroom at his mother's residence. He last saw it on or about April 15 in the trunk of his car. He frequently left his car keys on the bedroom dresser or the dining table at his mother's residence. When he looked in the trunk of his car on April 22, the rifle was gone.

Norma White testified that she is the mother of Waller and Rosas. In the two-week period before April 22, defendant slept at her residence four to six times. Defendant used Rosas's bedroom, at the far end of the house. White gave defendant permission to spend the night of April 21-22 at her residence. Defendant was still awake when she retired at 11:30 p.m. on April 21.

Dave Hughes testified he was sleeping in his van in the driveway of his mother's residence, next door to the residence of Bloom, Sr., when he was awakened about 4 a.m. on April 22. He heard Bloom, Sr., shout: "Robert, Robert. Come back." Bloom, Sr., was standing at the end of the driveway of

his own residence. After shouting the same words again, Bloom, Sr., began running down the street. A short time later Bloom, Sr., returned with defendant and they entered the Bloom residence together. About three minutes later Hughes again observed Bloom, Sr., standing in the driveway and shouting for "Robert" to come back to the house. Hughes heard a small popping noise, which he recognized as a gunshot from a small caliber weapon, and saw Bloom, Sr., grab the lower portion of his body. As Bloom, Sr., trotted toward the front door of his residence, defendant came running toward him carrying a .22-caliber rifle. Defendant fired two more shots and there was a noise of breaking glass. Bloom, Sr., fell on his back in the doorway. Defendant fired two more shots at Bloom, Sr., as defendant stood directly over him. Defendant then ran into the house. Hughes heard a woman's wordless scream followed by two shots and then, after a brief pause, another shot. Hughes went into his mother's residence and telephoned the police. On his return to the van, Hughes saw defendant leave in a maroon Monte Carlo automobile which had been parked in the Blooms' driveway.

Some of these events were also witnessed by Moises Gameros, who lived across and down the street from the Bloom residence. Gameros testified he was in the bathroom of his residence at about 4 a.m. when he heard someone in the street yelling "Robert, Robert." Gameros saw defendant, holding a rifle, apparently being chased by Bloom, Sr. Defendant and Bloom, Sr., appeared to be arguing but Gameros could not make out the words until Bloom, Sr., in a loud voice, said: "That's it. I'm going to call the police." Bloom, Sr., then walked back to his residence with defendant following 25 feet behind. They both entered the residence, but a short time later defendant came out, followed by Bloom, Sr. Gameros heard a shot and saw Bloom, Sr., run screaming toward his house. Defendant was following 10 feet behind pointing the rifle at Bloom, Sr.'s back. Another shot sounded and Bloom, Sr., fell on the porch. Defendant pointed the rifle down and fired again. Defendant stood in that position for about a minute, during which he made hand motions as if reloading the rifle. Defendant then entered the house. Defendant came out after about five minutes and stood on the porch. After again going inside the residence for a short time, defendant placed the rifle in a car parked in the driveway and drove off in that car.

A police officer who arrived at the scene shortly after defendant's departure found the bodies of Bloom, Sr., and Mrs. Bloom, and critically wounded Sandra. Two bullet holes were found in the living room window, and .22-caliber cartridge casings and live rounds were found at various locations inside and outside the house. When Mrs. Bloom's body was moved, a bullet was found imbedded in the floor beneath her head. Scissors were found on

the bed in the bedroom where Sandra was found; the sheets and blankets on this bed were stained with blood.

Defendant was found and arrested near Waller's house at approximately 4:30 a.m. Defendant was on foot. Later that morning defendant was observed singing and dancing in his cell. The maroon Monte Carlo, which was registered to Mrs. Bloom, was found one mile from Waller's residence, near a park and an abandoned dump; keys to this vehicle and to the Bloom residence were found in a wash area approximately 70 feet from the vehicle. Despite an intensive search, the rifle used by defendant to commit the murders was never found.

Bloom, Sr., was killed by gunshot wounds to the head, neck, and abdomen. Mrs. Bloom was killed by three shots to the head, entering at the left temporal scalp, the right side of the head, and the left upper back of the head. Sandra was killed by a shot to the head, entering on the right side of the nose. This wound very likely would have made it impossible for Sandra to take purposeful action but it may well have caused convulsions or involuntary bodily movements. A second gunshot wound on the right upper arm showed minimal penetration, possibly due to a defective round. There were 23 "sharp force" wounds, clustered on the forehead, back of the neck, right arm, and left back. The abraded edges and lack of deep penetration were consistent with the wounds having been made by the scissors found at the scene. There were also scratches on Sandra's left wrist and palm which could have been defensive injuries. It could not be determined by autopsy examination whether the gunshot wounds preceded or followed the sharp-force injuries.

B. *Defense Evidence.*

Defendant, testifying in his own behalf, admitted attempting to obtain a handgun from Medrano, and he admitted that he killed Bloom, Sr. According to defendant, he was watching television in a bedroom at Waller's residence at about 3 a.m., after the other residents had retired for the night, when he heard some men talking outside the house. Defendant went outside to investigate, taking Rosas's .22-caliber rifle, which defendant had found in the bedroom and had loaded with 18 rounds. He saw two men, described by defendant as "cholos." When they ran away, defendant followed them for about a mile. After these men fired three shots at him, defendant gave up the pursuit. Finding himself near the house of Bloom, Sr., he went there and entered the unlocked front door carrying the rifle. Bloom, Sr., and Mrs. Bloom were arguing about her desire for divorce. Defendant placed the rifle on a chair near the arguing couple and went with Sandra, who had been watching the argument, into Sandra's bedroom. Defendant was playing

with Sandra when he heard a gunshot. Mrs. Bloom walked toward her bedroom, bleeding from a wound in her face. She collapsed when Bloom, Sr., shot her a second time with the rifle. Defendant picked up the gun when Bloom, Sr., dropped it and left the house after Bloom, Sr., refused to call the police. Bloom, Sr., followed and eventually returned with defendant to the house after agreeing to notify the police.

According to defendant, Bloom, Sr., continued to refuse to call the police, and defendant again went outside. Bloom, Sr., again followed. Finally, after Bloom, Sr., made a remark about Sandra (which defendant at trial refused to repeat), defendant shot him. Bloom, Sr., ran back to the house and fell on the threshold. Defendant was standing over Bloom, Sr., about to shoot him again, when he made eye contact with Sandra, who was standing some 18 feet away. Defendant pulled the trigger and, according to his testimony, "the next thing that happened" was that he was arrested while walking near the Waller residence.[1]

Various family members and friends testified as defense witnesses regarding Bloom, Sr.'s relationships with defendant and Mrs. Bloom, and the circumstances under which he had married Mrs. Bloom. These witnesses characterized Bloom, Sr., as aggressive, vicious, greedy and abusive, and testified that he regularly insulted and humiliated defendant.

A defense psychiatrist, Dr. Kling, testified he examined defendant and initially concluded defendant was sane and had substantial capacity to understand and control his conduct, to form the specific intent to murder, to premeditate and deliberate, and to reflect meaningfully on the gravity of his acts. Following a second interview, however, Dr. Kling altered his opinion, concluding that defendant was affected by a "schizoid personality disorder" characterized by eccentric thoughts, bizarre fantasies and paranoid ideation. According to Dr. Kling, such persons can act violently under stress; extreme stress may result in a "transient psychotic episode" during which the person is unaware of what he is doing.

From his discussions with defendant, Dr. Kling learned that defendant had contemplated killing Bloom, Sr., for several weeks, although he had not actually planned to do so. Kling opined that defendant could have been experiencing a transient psychotic episode when he killed Bloom, Sr.

---

[1] Although this testimony was interpreted by both the prosecutor and defense counsel as a claim that defendant did not remember any intervening events, it seems equally consistent with a simple refusal to discuss those events.

### III. Guilt Phase Issues

A. *Sufficiency of Evidence of Premeditation.*

■ Defendant first contends that the evidence was insufficient to sustain the jury's findings that the murders were premeditated.

Issues regarding the sufficiency of the evidence are determined according to well-established legal principles. ■ "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468].) The reviewing court presumes in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 346-347 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) ■ Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction. (See *Bloyd,* supra, 43 Cal.3d at p. 347; *In re Tony C.* (1978) 21 Cal.3d 888, 900 [148 Cal.Rptr. 366, 582 P.2d 957]; *People* v. *Moore* (1957) 48 Cal.2d 541, 547 [310 P.2d 969].) ■ "Whether the evidence presented at trial is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253], italics in original.)

■ Viewed in light of these principles, evidence relevant to the premeditation issue established, either directly or by reasonable inference, that defendant went to Bloom, Sr.'s residence with a stolen .22-caliber rifle shortly before 4 a.m. intending to kill Bloom, Sr., after which he intended to dispose of the murder weapon and to return to his girlfriend's residence, where he was then staying, before his absence was noted. Defendant either found Bloom, Sr., awake or inadvertently awakened him, they argued loudly, Bloom, Sr., threatened to call the police, and defendant killed him, firing five shots in the process. The final two shots were fired while Bloom, Sr., was sprawled in the doorway of his residence and defendant was standing over the body and firing down into Bloom, Sr.'s head. Rather than leave the scene, defendant reloaded or readjusted the rifle and entered the residence, where he shot Mrs. Bloom three times in the head, shot Sandra once in the head and once in the arm, and stabbed Sandra twenty-three times with scissors. Defendant then left the scene and disposed of the rifle so effectively

it was never found, abandoned the vehicle he had taken from the Bloom residence, and was approaching his girlfriend's residence on foot when he was stopped and arrested by police at approximately 4:30 a.m.

■ This court has identified three categories of evidence which serve to sustain a finding of premeditated murder: (1) evidence of prior planning of the killing; (2) evidence of a prior relationship and/or conduct with the victim from which the jury could infer a motive to kill; and (3) evidence that the manner of the killing was so particular and exacting that the killing must have been according to a preconceived design. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].) To sustain a verdict of first degree murder it is not necessary that all three types of evidence be present; extremely strong evidence of prior planning alone will be sufficient, as will evidence of motive in conjunction with evidence of either prior planning or a particular and exacting method of killing. (*Id.* at p. 27.)

■ Here, all three categories of evidence were amply represented in the case against defendant for the murder of Bloom, Sr. Defendant did not deny he had a motive to kill Bloom, Sr., and, indeed, much of the defense case was devoted to demonstrating Bloom, Sr.'s continuous abuse and humiliation of defendant. The evidence of planning was also very strong. After unsuccessfully attempting to purchase a handgun for the stated purpose of killing someone, defendant stole a rifle, practiced with it, and carried it with him in the dead of night to Bloom, Sr.'s residence, having previously warned Bloom, Sr., that he would not be running defendant's life much longer. The manner of the killing likewise indicates a preconceived design. Having brought the rifle to Bloom Sr.'s residence, defendant shot Bloom, Sr., in the abdomen and then ran him down and shot him in the head and neck.

Defendant argues that the prior planning evidence should be disregarded because defendant twice attempted to walk away from Bloom, Sr.'s residence and was prevented from doing so by Bloom, Sr., thereby indicating that defendant had abandoned any plan to kill. That argument could be and was made to the jury, but it is unavailing on appeal. It represents but one interpretation of the evidence. Another interpretation is that when defendant unexpectedly found Bloom, Sr., awake, or inadvertently awakened him, defendant was disconcerted at finding himself face-to-face with his domineering father[2] and apparently attempted to leave. The intent demonstrated by this conduct was not an abandonment of the intent to kill but merely a

---

[2] Defendant's own testimony on this point is persuasive. Referring to Bloom, Sr., defendant stated: ". . . he's very intimidating . . . I don't care what kind of gun you have, it don't matter."

<div style="border-top:1px solid black"></div>

postponement of the killing to another time. When Bloom, Sr., stated he would call the police, however, and persisted in his attempts to have defendant remain at the Bloom residence, defendant realized that exposure of his plan was imminent and that it would be much harder to escape detection after a later killing if the police were apprised of his conduct on this occasion. It was, in short, now or never. Defendant's decision to carry out his intention without further delay was, in effect, a decision to carry out his original plan. The prior planning activity therefore supports a determination of premeditation. We conclude that the evidence, viewed as a whole, is sufficient to sustain the first degree murder verdict for the killing of Bloom, Sr.

There is also evidence of planning activity and motive sufficient to support the verdicts for the first degree murders of Mrs. Bloom and Sandra. Because Bloom, Sr., was killed only after a loud argument and the firing of five shots, two of which broke window glass, defendant must have either known or strongly suspected that Mrs. Bloom and Sandra were awake and had seen him. Indeed, defendant admitted in his testimony they had seen him at the residence. Defendant therefore had a motive to kill them to prevent them from reporting it was he who had killed Bloom, Sr., and from testifying against him. Defendant's conduct in reloading the rifle, or adjusting or inspecting it in some manner, and then entering the residence, constitutes planning activity indicating defendant had already formed the intent to kill Mrs. Bloom and Sandra. As his subsequent conduct indicates, defendant intended to return to Waller's residence without reporting the killing of Bloom, Sr., so there was no innocent reason for defendant's reentry into the Bloom residence. Defendant's conduct in manipulating the rifle in some way, and carrying it inside with him, supports an inference that he intended to put the rifle to further use inside the residence.

The manner in which defendant killed Mrs. Bloom was as particular and exacting as the manner in which Bloom, Sr., was killed. She was killed with three shots to the head, at least one of which was fired while she was lying on the floor. The 23 sharp-force wounds on Sandra's body, apparently caused by scissors, do not establish that the killing of Sandra was other than premeditated. After firing the fatal shot which struck Sandra in the face, and the second shot that struck Sandra in the arm, defendant apparently ran out of ammunition[3] or the gun may have jammed. Disturbed by Sandra's involuntary convulsions, or concerned that the gunshot wounds would

---

[3] The semiautomatic rifle used by defendant held 18 rounds of ammunition. The three victims suffered a total of eight gunshot wounds, two bullet holes were observed in the front windows, and eight live rounds were found scattered at the scene. Thus 18 rounds were accounted for. No evidence was offered to explain the presence of the live rounds. Presumably they spilled or were ejected from the rifle.

not be fatal, defendant attempted to hasten and ensure her death by stabbing her with the scissors. In this regard it is significant that Sandra alone, of the three victims, was still alive when the first police officer entered the Bloom residence.

Relying on *People* v. *Goedecke* (1967) 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213], and *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959], defendant argues that the undisputed evidence established he was mentally disturbed and suffering from a "schizoid condition" which prevented him from fully appreciating the wrongfulness of his actions, and that he for this reason lacked the "quantum of personal turpitude" required to sustain a first degree murder conviction. This argument is based on a faulty premise. The holdings in *Wolff* and *Goedecke,* that first degree murder requires proof of a defendant's mature and meaningful reflection on the gravity of his actions, were abrogated by amendment of section 189[4] (see Stats. 1981, ch. 404, § 7, p. 1593) shortly before the commission of the offenses in this case. To the extent it might still be required, the assessment of personal turpitude occurs in the process of determining the sufficiency of the evidence to establish premeditation and deliberation.

We conclude, accordingly, that the evidence, viewed as a whole, is sufficient to sustain the verdicts for the first degree murders of all three victims.

B. *Inadequate Premeditation Instructions.*

Defendant next argues that the trial court's instructions on the subject of premeditation were inadequate because they failed to explain the effect of defendant's supposed "abandoned" intent, previously discussed. Defendant points to the evidence indicating that even though he may have originally premeditated the slayings, he later abandoned that intent and unsuccessfully sought to leave the scene. The jury should have been instructed sua sponte, defendant maintains, "that evidence of premeditation is not sufficient . . . if it demonstrates no more than that a defendant formulated a plan to kill his victim which was later abandoned."

The court gave an instruction, in the language of CALJIC No. 8.20, stating that to constitute first degree murder the killing must be "the result of" premeditation, and not a sudden heat of passion or rash impulse. No reasonable juror would have believed that a premeditated murder finding

---

[4] Section 189 provides, in relevant part: "To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act."

could be made despite an abandonment of premeditated intent prior to the slaying, and the trial court had no sua sponte duty to instruct further on that subject. If defendant wanted more elaborate instructions on this point, he should have proposed them. (*People* v. *Poddar* (1974) 10 Cal.3d 750, 760 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366]; *People* v. *Forbs* (1965) 62 Cal.2d 847, 854 [44 Cal.Rptr. 753, 402 P.2d 825].)

## C. *Exclusion of Psychiatric Testimony.*

Defendant elicited psychiatric testimony from Dr. Kling regarding defendant's "schizotypal personality disorder," a condition which results in delusions, hallucinations or antisocial behavior. On cross-examination, the prosecutor determined from Dr. Kling that he had previously found defendant sane and capable of forming the specific intent to kill, premeditate and deliberate. On redirect, defense counsel asked Dr. Kling a hypothetical question as to whether an attempt to flee the victim's presence by one who had previously contemplated a killing was inconsistent with a present premeditated intent to kill. The court sustained the prosecutor's objection that the question called for a legal conclusion.

■ Defendant argues that the question was appropriate to place before the jury relevant evidence on the subject of premeditation and deliberation. He observes that an expert such as Dr. Kling may offer opinions on the "ultimate issues" in the case (see Evid. Code, § 805), so long as the expert does not offer a direct opinion on the defendant's own required mental state (§ 29). Here, the challenged testimony was in the form of a response to a hypothetical question, and did not focus on defendant's mental state.

Assuming the question was proper, the court's error in sustaining the objection was harmless. At most, Dr. Kling would have responded that, depending on the circumstances, an attempt to flee the scene may indeed be inconsistent with a present premeditated intent to kill, a conclusion which any reasonable juror would form without expert assistance. Thus, Dr. Kling's opinion would have added very little to defendant's "abandoned intent" theory.

## D. *Death-qualified Jury.*

Defendant contends that the "death qualification" process deprived him of a fair trial. The argument has been repeatedly rejected by the courts. (See *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 78-79 [241 Cal.Rptr. 594, 744 P.2d

1127]; *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 (plur. opn.), 374 (Kaus, J., conc. opn.) [197 Cal.Rptr. 803, 673 P.2d 680].)

### E. *Prosecutorial Misconduct.*

The prosecutor likened defendant to the legendary villain Fu Manchu, and described both men as being "evil incarnate." ▇ Defendant now contends these comments were improper. In general, prosecutors should refrain from comparing defendants to historic or fictional villains, especially where the comparisons are wholly inappropriate or unlinked to the evidence. (See *People* v. *Hovey* (1988) 44 Cal.3d 543, 579-580 [244 Cal.Rptr. 121, 749 P.2d 776], and cases cited.) As in *Hovey*, however, the prosecutor's "hyperbole" in this case may have constituted a reasonably fair comment on the evidence, given the aggravated nature of defendant's multiple killings. In any event, defendant failed to object to the comment or seek an appropriate admonition. As an admonition would have been sufficient to cure any harm, the point cannot be raised on appeal. (*People* v. *Green, supra,* 27 Cal.3d 1, 34.)

Defendant also complains of a prosecutorial comment to the effect that it is not unusual in a murder case for the defendant to "create a defense" and "try and show the victim was an S.O.B. to excuse the act." Defendant asserts the prosecutor was improperly suggesting that, based on his experience as a prosecutor, he had determined that defendant's defense was a fraudulent one. (See *People* v. *Bolton* (1979) 23 Cal.3d 208, 212-213 [152 Cal.Rptr. 141, 589 P.2d 396] [prosecutor's improper reliance on facts not in evidence].) Here, unlike *Bolton* and the other cases cited by defendant, the prosecutor's assertion did not purport to be based on factual information known only to him. Moreover, even if the comment was improper, the suggestion that at trial some defendants fabricate defenses or attempt to vilify their victims was certainly not startling information likely to affect the jury's verdict. In any event, defendant made no objection to the prosecutor's remarks and an admonition would have cured any harm. The issue is not preserved for review. (*People* v. *Green, supra,* 27 Cal.3d 1, 34.)

### F. *Admonition Before Withdrawing Insanity Plea.*

Defendant originally pleaded not guilty to all counts. In addition, as to the murder of Sandra only, he pleaded not guilty by reason of insanity. After the jury returned the verdicts finding defendant guilty of the offenses charged, defense counsel announced that defendant was withdrawing his insanity plea. The court inquired of defendant whether he had conferred with his counsel on the matter, and whether he wished to withdraw the

plea. Defendant replied affirmatively, and the court allowed the plea to be withdrawn.

██ Defendant now complains that the court failed to expressly advise him regarding the various constitutional rights he would be foregoing by withdrawing his plea, including the privilege against self-incrimination and the rights to jury trial and confrontation. (See *People* v. *Redmond* (1971) 16 Cal.App.3d 931, 939 [94 Cal.Rptr. 543]; cf. *People* v. *Merkouris* (1956) 46 Cal.2d 540, 552-553 [297 P.2d 999] [improper withdrawal of insanity plea despite court's doubts as to defendant's competence].)

The People observe that *Merkouris* and *Redmond* are distinguishable, for each case involved improper withdrawals of insanity pleas despite the existence of some *doubt* as to the defendant's sanity. In the present case neither the trial court nor defendant's own experts had indicated any doubt regarding his sanity. Dr. Kling had originally concluded that defendant was sane at the time of the murders. Although he later took the position that defendant had a "schizotypal personality disorder" which might have affected his ability to premeditate, Dr. Kling neither disclaimed nor revised his earlier opinion about defendant's sanity. Thus, the case is controlled by our opinion in *People* v. *Guerra* (1985) 40 Cal.3d 377, 384 [220 Cal.Rptr. 374, 708 P.2d 1252], quoting with approval language in *Redmond, supra*, 16 Cal.App.3d 931, 939, that no recitals of constitutional rights need be given " 'where there is no doubt of a defendant's sanity in the mind of the trial court and the reports of the examining psychiatrists unanimously indicate that such defendant was sane at the time of the offense. Free withdrawal of the insanity plea under such circumstances should be permitted as it has been in the past.' " ██ Dr. Kling's testimony regarding defendant's personality disorder was insufficient, as a matter of law, to raise a doubt regarding defendant's sanity under *Guerra* or *Redmond*.

We conclude that the guilt judgment and special circumstance finding should be affirmed.

## IV. PENALTY PHASE FACTS

### A. *Motion for Self-representation.*

On December 5, 1983, following the return of the guilt phase verdicts, defendant requested that he be allowed to represent himself (to "go pro. per.," as defendant phrased it) for the penalty phase, with his attorney to remain as "cocounsel." Defendant stated that he did not want to put on a defense, that it would be "counterproductive" to do so because he did not "intend spending the rest of [his] natural life in some institution," and that

if granted self-representation he would help the prosecution obtain a death verdict and would address the jury and "seek the death penalty." Defense counsel stated that if allowed to remain in control of the case he would be willing to inform the jury of defendant's preference for a death verdict and defendant's reasons therefor, but defendant said he wanted to address the jury personally and noted that he could "always take the stand." The court recessed until the following day to consider the request.

When proceedings resumed, on December 6, defendant affirmed that it was still his wish to represent himself with his attorney as "cocounsel." The court found that defendant possessed sufficient intellect to understand the proceedings, to read and write, and to address the court and the jury. The court further found that defendant understood the gravity of the situation. Defendant's attorney stated that defendant had instructed him to take no affirmative action regarding witnesses for the penalty phase, although defendant himself intended to call "witnesses which would aid the prosecution in obtaining the death penalty." Defendant affirmed that this was correct. The attorney stated that if the motion was granted he would advise defendant on proper procedures and on how to address any requests to the court. The trial court told defendant he was "making an enormous mistake" but acknowledged "there are few things more personal to an individual than the decisions you are making right now." Defendant requested a continuance and law library privileges, asking rhetorically, "How can I go up against a man who has been practicing law longer than I have been alive?" The trial court observed that it appeared defendant would be "concurring with the position the People are taking," rather than opposing it. The prosecutor suggested a brief continuance, to December 12, and defendant stated that would be satisfactory. The trial court then granted defendant's request for "co-counsel status" with the understanding that his attorney would "stand ready at all reasonable hours to advise" defendant and to "assist" him in any way, to appear with defendant at court hearings, and to aid defendant in his presentation of the case at the penalty phase. Defendant's attorney stated that he would advise defendant on legal matters but would not participate in the examination or cross-examination of any witnesses, including defendant, and would not address the jury. Defendant did not indicate any objection to this arrangement. Defendant's attorney stated that while he personally disagreed with defendant's decision to seek the death penalty, he believed himself professionally obligated to defer to his client's wishes.

When proceedings resumed on December 12, defendant's attorney reported to the court that on two successive evenings he had attempted without success to persuade defendant to allow counsel to control presentation of the defense case at the penalty phase and to seek "the lesser of the

penalties available to the jury." The court inquired whether, having had further time to think about the decisions he had previously made, defendant wished "to proceed as co-counsel in this phase of the trial." Defendant answered in the affirmative.

### B. *The Aggravating Evidence.*

The prosecutor called two witnesses to testify concerning an attempted robbery committed by defendant. This occurred in November 1981 at a Bible study meeting for women attended by approximately 27 people. After sitting in the meeting for five or ten minutes, and sharing in the offered refreshments, defendant removed a BB or pellet gun from his overcoat, pointed it at a woman's head, and demanded her purse. The woman refused and defendant's attempts to grab it away from her were unsuccessful. Defendant fled from the room after another woman screamed. Defendant was arrested two days later while walking along a sidewalk when officers observed the handle of his pellet or BB gun in the pocket of his trench coat. Defendant later told the arresting officers he was upset they had pointed their guns at him and would have shot one of them but did not because the officer was behind the door of the police car. On cross-examination, defendant elicited testimony that he was carrying a large quantity of BB's and what appeared to be a "robbery kit" when arrested.

During a bench conference, defendant complained that the prosecution was doing a poor job of presenting the aggravating evidence. Defendant offered to stipulate that he committed a second attempted robbery for which he had been arrested but not charged. However, the prosecutor would not accept the stipulation. On cross-examination of a police officer, defendant elicited testimony that on the day preceding the attempted robbery at the Bible study meeting, an elderly couple had been accosted by a young man wearing a raincoat. This man produced a handgun, demanded money, and fired a shot when the couple refused to give up their money. No one was injured and no property was taken. Defendant established that he had been arrested for this attempted robbery.

### C. *The Closing Arguments and Verdict.*

The prosecutor urged imposition of the death penalty, based on the charged offenses, the aggravating circumstances, defendant's lack of remorse, and defendant's failure to proffer any mitigating evidence.

Defendant then addressed the jury, also urging it to impose the death penalty. Defendant explained that he deserved to die because one who takes a life should die for it, and that he wanted to die. Although defendant stated

there were no mitigating circumstances, he did refer to evidence at the guilt phase regarding his abuse at the hands of Bloom, Sr., stating that "Every man on the jury, if you knew the facts on [*sic*] my life, you'd kill him too."

The jury imposed a death sentence.

D. *Subsequent Events.*

Prior to the sentencing hearing, held to consider modification of the jury's death sentence (see § 190.4, subd. (e)), defendant moved that another attorney be appointed cocounsel to assist him in the hearing. Defendant claimed that his communications with trial counsel had broken down, and stated that he now questioned the trial tactics and competence of that attorney. Following a hearing, the court denied the motion, finding that defendant and the attorney had cooperated well during the trial, that the attorney had demonstrated his competence, and that there was no showing of any need for appointment of new counsel at this stage of the proceedings.

At a subsequent hearing to seek a continuance of the sentencing hearing, defense counsel announced to the court that he and defendant had resolved many of their differences and that defendant was prepared to cooperate with him. The court granted a 30-day continuance. A few weeks later, however, defendant stabbed another inmate in the library. The court revoked defendant's self-representation status and ordered psychiatric evaluations and a competency hearing before a jury.

During the psychiatric evaluations defendant admitted he had sought the death penalty not for purposes of ending his life but to expedite his appeal to this court. According to one of the examining psychiatrists, defendant said, in an apparent reference to the automatic appeal in death penalty cases, that he was "confident that the State Supreme Court will overturn [his case], and the sooner it goes up there the sooner he has a chance of being acquitted or having the ruling overturned."

The jury found that defendant remained competent to cooperate with counsel. Thereafter the court restored defendant's self-representation status and the sentencing hearing ensued. Defendant's mother and grandmother appeared and asked that defendant's life be spared. The court denied defendant's motion for new trial and modification of sentence, and defendant was sentenced to death.

## V. Penalty Phase Issues

A. *Failure to Offer Mitigating Evidence—Denial of Effective Counsel.*

Defendant contends that the failure to present mitigating evidence at the penalty phase, in conjunction with his own request to the jury for a death verdict, deprived him of his right to effective assistance of counsel and offended the state's interest in ensuring the reliability of capital penalty determinations. The issues raised by this contention are essentially the following: (1) whether the trial court erred in granting defendant's motion for self-representation; (2) whether defendant may be permitted to assert a claim of ineffective assistance of counsel for failure to present mitigating evidence at the penalty phase; and (3) whether the constitutional standards for the reliability of capital verdicts have been satisfied.

*Motion for self-representation.* Defendant argues that because he sought only cocounsel status rather than full self-representation, and because the motion was made only after the guilt verdicts were returned, his motion for leave to participate actively in the trial proceedings "had no constitutional basis but was merely 'addressed to the sound discretion of the court.' " The granting of the motion was an abuse of discretion, he further argues, because his announced purpose in making the motion was to seek a death verdict, a purpose which violates a public policy against misusing the judicial system to commit state-aided suicide. Before addressing these arguments directly, it is necessary to clarify the nature of defendant's motion.

 While the Sixth Amendment guarantees both the right to self-representation and the right to representation by counsel, a defendant who elects representation by counsel does not have a constitutionally protected right to appear as cocounsel (*People* v. *Hamilton, ante,* p. 1162, 259 Cal.Rptr. 701; *People* v. *Moore* (1988) 47 Cal.3d 63, 77 [252 Cal.Rptr. 494, 762 P.2d 1218]; *People* v. *Miranda, supra,* 44 Cal.3d 57, 75), and a defendant who elects self-representation "does not have a constitutional right to choreograph special appearances by counsel" (*McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 183 [79 L.Ed.2d 122, 136, 104 S.Ct. 944]). Thus none of the "hybrid" forms of representation, whether labeled "cocounsel," "advisory counsel," or "standby counsel," is in any sense constitutionally guaranteed.

As the courts of other jurisdictions have expressly recognized (see *Ortberg* v. *State* (Alaska App. 1988) 751 P.2d 1368, 1375; *Parren* v. *State* (1987) 309 Md. 260 [523 A.2d 597, 599]), the powers and responsibilities which attend the representation of a criminally accused person should never

be conferred jointly and equally on the accused and the attorney. Rather, in all cases of shared or divided representation, either the accused or the attorney must be in charge. Stated otherwise, at all times the record should be clear that the accused is either self-represented or represented by counsel; the accused cannot be both at once. A defendant represented by counsel who wishes to participate in the presentation of the case, but without surrendering the benefits of professional representation, may do so only with counsel's concurrence and under counsel's supervision, and only by leave of the court upon a proper showing. (*People v. Hamilton, supra, ante,* pp. 1162-1163.) Similarly, a self-represented defendant who wishes to obtain the assistance of an attorney in an advisory or other limited capacity, but without surrendering effective control over presentation of the defense case, may do so only with the court's permission and upon a proper showing.

Viewed in light of these principles, defendant's motion was plainly one for self-representation, with an added request that his attorney remain in a limited and chiefly advisory capacity. As noted, defendant stated he wanted to "go pro. per." Although defendant used the word "cocounsel" on several occasions, his intended purpose was to assume control of the case, rather than merely to assist his attorney in its presentation. (See *People v. Windham* (1977) 19 Cal.3d 121, 125, fn. 2 [137 Cal.Rptr. 8, 560 P.2d 1187].) Defendant's stated purpose of obtaining a death verdict was contrary to the advice of his attorney, who urged defendant to permit counsel to seek the lesser penalty of imprisonment for life without possibility of parole. To achieve his preferred verdict, defendant proposed to address the jury personally and to examine witnesses in a manner designed to aid the prosecution in obtaining the death penalty. To prevent frustration of his goal, defendant told the attorney that calling penalty phase witnesses would not be part of the attorney's role or function. The trial court described the proposed duties of the attorney as advising and assisting defendant, appearing with defendant, and aiding defendant in his presentation of the case. For his part, the attorney stated he would advise defendant on proper procedures and on how to address any requests to the court but would not examine or cross-examine witnesses or address the jury. As defendant sought complete control over the content and presentation of his own case at the penalty phase, the motion is properly treated as one for self-representation.

We return to the question whether the trial court erred or abused its discretion in granting this motion for self-representation. If a request for self-representation is unequivocally asserted within a reasonable time before the commencement of the trial, and if the assertion is voluntarily made with an appreciation of the risks involved, the trial court has no discretion to deny it. (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d

562, 95 S.Ct. 2525]; *People* v. *Windham, supra,* 19 Cal.3d 121, 128.) A request for self-representation asserted for the first time after trial has commenced, on the other hand, is "based on nonconstitutional grounds" (*Windham, supra,* at p. 129, fn. 6) and is addressed to the sound discretion of the trial court (*id.* at p. 128). ▮ So defendant is correct in asserting that his motion for self-representation, made for the first time after the guilt phase of his capital trial, did not have a constitutional basis and was addressed to the trial court's discretion. (See *People* v. *Hamilton* (1988) 45 Cal.3d 351, 369 [247 Cal.Rptr. 31, 753 P.2d 1109].)

▮ The rule against invited error generally precludes a defendant from obtaining reversal of a judgment by asserting error in the granting of the defendant's own motion. ▮▮▮ ▮ In this instance we do not understand defendant to be asserting that the granting of his motion for self-representation was error because the motion was untimely or because the showing made in support of the motion was insufficient under the criteria established in *Windham, supra,* 19 Cal.3d 121, 128.[5] Rather, defendant maintains that the ruling on his motion was an abuse of discretion because the motion's announced purpose, obtaining a verdict of death, is contrary to fundamental public policy.

The issue presented, then, is whether a trial court in a capital case abuses its discretion by granting a competent defendant's midtrial motion for self-representation, when the motion is made for the announced purpose of seeking a verdict of death. We conclude that in such a case the defendant's stated intention to incur the death penalty does not in and of itself establish an abuse of discretion in the granting of the self-representation motion.

Although defendant's midtrial motion for self-representation did not have a constitutional basis (*Windham, supra,* 19 Cal.3d 121, 129, fn. 6), the United States Supreme Court's decision in *Faretta* v. *California, supra,* 422 U.S. 806, recognizing a Sixth Amendment right of self-representation, is nonetheless instructive on the point raised by defendant. ▮ The basic teaching of *Faretta* is "that the state may not constitutionally prevent a defendant charged with commission of a criminal offense from controlling his own fate by forcing on him counsel who may present a case which is not consistent with the actual wishes of the defendant." (*Windham, supra,* 19 Cal.3d 121, 130.) As the high court stated: "The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools

---

[5] Factors to be considered by the court in ruling on a midtrial motion for self-representation include "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham, supra,* 19 Cal.3d 121, 128.)

guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment." (*Faretta, supra*, 422 U.S. at p. 820 [45 L.Ed.2d at p. 573].)

The United States Supreme Court found firm support for this conclusion in a review of the Sixth Amendment's historical origins. The common law rule in England, as the court noted, "has evidently always been that 'no person charged with a criminal offense can have counsel forced upon him against his will.'" (*Faretta, supra*, 422 U.S. at p. 826 [45 L.Ed.2d at p. 576].) The one exception serves only to reinforce the rule: the only English tribunal ever to adopt a practice of forcing counsel upon an unwilling defendant was the Star Chamber, whose name has "for centuries symbolized disregard of basic individual rights." (*Id.* at p. 821 [45 L.Ed.2d at p. 574], fn. omitted.) In prerevolutionary America, "the basic right of self-representation was never questioned" (*id.* at pp. 827-828 [45 L.Ed.2d at p. 577]), and in federal courts "the right of self-representation has been protected by statute since the beginnings of our Nation" (*id.* at p. 812 [45 L.Ed.2d at p. 569]). When the Sixth Amendment was drafted, "[n]o State or Colony had ever forced counsel upon an accused; no spokesman had ever suggested that such a practice would be tolerable, much less advisable." (*Id.* at p. 832 [45 L.Ed.2d at p. 579].) In short, it is clear that "[t]he Founders believed that self-representation was a basic right of a free people" (*id.* at p. 830, fn. 39 [45 L.Ed.2d at p. 578]) and that "the notion of compulsory counsel was utterly foreign to them" (*id.* at p. 833 [45 L.Ed.2d at p. 580]).

The core rationale of *Faretta* is that an "unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction" (*Faretta, supra*, 422 U.S. at p. 821 [45 L.Ed.2d at p. 573]), and that "although [the defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law'" (*id.* at p. 834 [45 L.Ed.2d at p. 581], quoting *Illinois* v. *Allen* (1970) 397 U.S. 337, 350-351 [25 L.Ed.2d 353, 363, 90 S.Ct. 1057] (Brennan, J., conc.)).

This court's opinions have been sensitive to the basic Sixth Amendment values found controlling in *Faretta, supra*, 422 U.S. 806. On numerous occasions we have "recognized the need to respect the defendant's personal choice on the most 'fundamental' decisions in a criminal case."[6] (*People* v.

---

[6] A few exceptions to this rule have been established by statutory or constitutional mandate. (See, e.g., *People* v. *Upshaw* (1974) 13 Cal.3d 29, 33-34 [117 Cal.Rptr. 668, 528 P.2d 756] [Cal. Const., art. I, § 16, bars represented defendant from waiving jury trial without counsel's consent]; *People* v. *Chadd* (1981) 28 Cal.3d 739, 746 [170 Cal.Rptr. 798, 621 P.2d

*Frierson* (1985) 39 Cal.3d 803, 814 [218 Cal.Rptr. 73, 705 P.2d 396].)

Thus even in a capital case defense counsel has no power to prevent the defendant from testifying at trial (*People* v. *Lucky* (1988) 45 Cal.3d 259, 282 [247 Cal.Rptr. 1, 753 P.2d 1052]) and the defendant may testify at the penalty phase to a preference for the death penalty (*People* v. *Guzman* (1988) 45 Cal.3d 915, 961-963 [248 Cal.Rptr. 467, 755 P.2d 917]; *People* v. *Grant* (1988) 45 Cal.3d 829, 849-850 [248 Cal.Rptr. 444, 755 P.2d 894]).

By exercise of the right of self-representation, a capital defendant may dispense with the advice and assistance of counsel entirely (*People* v. *Joseph* (1983) 34 Cal.3d 936, 945 [196 Cal.Rptr. 339, 671 P.2d 843]), waive jury trial, and elect not to oppose the prosecution's case at the guilt phase (*People* v. *Teron* (1979) 23 Cal.3d 103, 108-115 [151 Cal.Rptr. 633, 588 P.2d 773]; see also, *People* v. *McKenzie* (1983) 34 Cal.3d 616, 628 [194 Cal.Rptr. 462, 668 P.2d 769] ["The choice of self-representation preserves for the defendant the option of conducting his defense by nonparticipation."]). As this court has remarked, "a capital defendant representing himself under *Faretta* has no duty to 'present a defense' but may simply 'put the state to its proof' . . . [and] can presumably also take the stand and confess guilt." (*People* v. *Chadd, supra*, 28 Cal.3d 739, 750, fn. 7 (per Mosk, J.).)

Similarly, neither the trial court nor defense counsel can compel a competent defendant to present an insanity defense, no matter how strong the available evidence of the defendant's insanity at the time of the charged acts. (*People* v. *Gauze* (1975) 15 Cal.3d 709, 717-718 [125 Cal.Rptr. 773, 542 P.2d 1365] (per Mosk, J.).) The defense attorney in *Gauze,* expressing a view also taken by defendant's trial attorney in this case, stated to the trial court: "I determine it to be a mandate of the Court by appointing me on this case that I am to proceed according to [the defendant's] wishes." (*Id.* at p. 717.) This court endorsed the view that both court and counsel are obligated to respect a competent defendant's considered and voluntary decisions on matters of fundamental importance affecting trial of the action: ". . . defendant Gauze made a free and voluntary choice with knowledge of its consequences. Neither counsel nor the court had power to contravene that choice." (*Id.* at p. 718.)

Given the importance which the decisions of both this court and the United States Supreme Court have attached to an accused's ability to control his or her own destiny and to make fundamental decisions affecting trial of the action, and given this court's recognition that it is not irrational to prefer the death penalty to life imprisonment without parole (*People* v.

837] [§ 1018 requires counsel's consent to guilty plea in capital case]; *People* v. *Stanworth* (1969) 71 Cal.2d 820, 834 [80 Cal.Rptr. 49, 457 P.2d 889] [§ 1239, subd. (b), precludes abandonment of automatic appeal from judgment of death].)

*Guzman, supra,* 45 Cal.3d 915, 963-965),[7] it would be incongruous to hold that a trial court lacked power to grant a midtrial motion for self-representation in a capital case merely because the accused stated an intention to seek a death verdict. While we do not suggest that trial courts must or even should grant such midtrial motions, we do not find the trial court's ruling on the motion in this case to be violative of defendant's rights or contrary to any fundamental public policy.

Granting defendant's midtrial motion for self-representation did not contravene the policy against state-aided suicide (see *People* v. *Deere* (1985) 41 Cal.3d 353, 362-363 [222 Cal.Rptr. 13, 710 P.2d 925]). First, defendant's proposed strategy by no means ensured the return of a death verdict. Faced with a defendant arguing a preference for the death penalty after conviction of death-eligible offenses, a jury might well conclude that death was "too good" for the defendant and that life imprisonment with no hope of parole would be the more severe and more appropriate punishment. Second, if the trier of penalty has determined death to be the appropriate punishment, and the death judgment meets constitutional standards of reliability, the judgment cannot reasonably be regarded as the defendant's doing (other than by his commission of the capital crimes) or its execution as suicide. Finally, as discussed more fully below, defendant's argument would effectively preclude death penalty prosecution of self-represented capital defendants who decline to present mitigating evidence, as there is no effective means to compel a pro se defendant to make an affirmative penalty defense.

We are not the first court to conclude that a capital defendant's announced intention to seek the death penalty does not compel denial of a motion for self-representation. In *Hamblen* v. *State* (Fla. 1988) 527 So.2d 800, the trial court granted a capital defendant's motion for self-representation after the defendant announced his intention to plead guilty and seek the death penalty. On appeal, as in the present case, defendant contended it was error to grant the motion because it resulted in a penalty trial at which no

---

[7] While qualitatively different from the death penalty, the punishment of life imprisonment without hope of release has been regarded by many as equally severe: "When a person is doomed to spend his final years imprisoned, with no (or few) prospects of release, then in terms of his human dignity, his individuality, his freedom, and his autonomy, one could well argue that the oppressive confines of a prison constitute as great an infringement of his basic human rights as a death sentence." (Sheleff, Ultimate Penalties (1987) p. 56.) Life imprisonment without possibility of parole has been described as " 'not so much a substitute for capital punishment, as a slower and more disadvantageous method of inflicting it.' " (*Id.* at p. 62, quoting penologist William Tallack.) As the philosopher John Stuart Mill put it: " 'What comparison can there really be, in point of severity between consigning a man to the short pang of a rapid death, and immuring him in a living tomb, there to linger out what may be a long life in the hardest and most monotonous toil, without any of its alleviation or rewards— debarred from all pleasant sights and sounds, and cut off from all earthly hope, except a slight mitigation of bodily restraint, or a small improvement of diet?' " (*Id.* at p. 60.)

defense to the death penalty was presented. The Florida Supreme Court rejected this contention, stating that "in the final analysis, all competent defendants have a right to control their own destinies," and that "there was no error in not appointing counsel against [the defendant's] wishes to seek out and to present mitigating evidence and to argue against the death sentence." (*Id.* at p. 804.)

The Illinois Supreme Court had earlier reached the same conclusion, stating: "We do not agree that the defendant's waiver of counsel should not have been accepted because the waiver frustrated the statutory intention to provide the sentencing body with all relevant mitigating evidence and this could best be done through counsel." (*People* v. *Silagy* (1984) 101 Ill.2d 147 [77 Ill.Dec. 792, 461 N.E.2d 415, 431], cert. den. 469 U.S. 873 [83 L.Ed.2d 156, 105 S.Ct. 227].) In that case, as here, the trial court had granted the defendant's request, made immediately after being found guilty of capital offenses and for the purpose of obtaining a death verdict, to proceed without counsel for the penalty phase. As here, the attorney remained in an advisory role and no mitigating evidence was presented at the penalty phase. On appeal defendant argued that "Society's interest in maintaining the integrity of the sentencing process . . . must take precedence over his personal right to represent himself in a criminal proceeding." (*Id.* at p. 175 [461 N.E.2d at p. 429].) After noting that the right of self-representation is protected by the Sixth Amendment, that the defendant's decision to discharge counsel was knowingly and intelligently made, and that his announced preference for the death penalty was not irrational, the court stated: "Nor do we consider, as the defendant says, that his decision to discharge his attorneys interfered with society's interest in the fair administration of justice. . . . [¶] Society's interest in the proper administration of justice is preserved by giving a defendant the right freely to present evidence in mitigation, by requiring the sentencing body to find aggravating factors before imposing the death penalty, and by requiring that a sentence of death be reviewed by this court." (*Id.* at p. 181 [461 N.E.2d at pp. 431-432].)

 A defendant may challenge the grant of a motion for self-representation on the basis that the record fails to show that the defendant was made aware of the risks of self-representation. Defendant has not challenged the granting of his self-representation motion on this basis, but we have nonetheless examined the record to determine whether it sufficiently reflects a knowing and intelligent waiver of the right to counsel. As we explain, it does.

A defendant seeking self-representation "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes

open.' " (*Faretta, supra*, 422 U.S. at p. 835 [45 L.Ed.2d at p. 582].) The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. (*U.S.* v. *McDowell* (6th Cir. 1987) 814 F.2d 245, 249; *Fitzpatrick* v. *Wainwright* (11th Cir. 1986) 800 F.2d 1057, 1065; *United States* v. *Kimmel* (9th Cir. 1982) 672 F.2d 720, 722; *People* v. *Longwith* (1981) 125 Cal.App.3d 400, 408 [178 Cal.Rptr. 136]; *Zimmerman* v. *Municipal Court* (1980) 111 Cal.App.3d 174, 179 [168 Cal.Rptr. 434].)

■■■ The trial court in this case gave few specific warnings or advisements regarding the risks of self-representation, but in the unusual situation facing the court an elaborate catalog of dangers and pitfalls was unnecessary. As the trial court observed, defendant would be assisting rather than opposing the prosecutor and not only appreciated the risk of a death verdict but actively sought it. The record reveals, and the trial court found, that defendant possessed sufficient intellect to understand the proceedings and to address the court and the jury. Defendant was aware of the possible penalty verdicts on each count, and was advised by the trial court that his decision was "an enormous mistake." Defendant acknowledged that the prosecutor had practiced law longer than defendant had been alive and thus would be a skilled opponent. The record therefore establishes that defendant was sufficiently aware of the dangers and disadvantages of self-representation and made his decision with open eyes.

■■■ Although some cases have suggested that a defendant seeking self-representation ought to be advised that a self-represented defendant is precluded on appeal from asserting ineffective assistance of counsel (e.g., *People* v. *Doane* (1988) 200 Cal.App.3d 852, 860, fn. 1 [246 Cal.Rptr. 366]; *People* v. *Spencer* (1984) 153 Cal.App.3d 931, 945 [200 Cal.Rptr. 693]), we agree with the holding in *Longwith, supra*, 125 Cal.App.3d at p. 409, that such a warning is not constitutionally required.[8] ■■■ The defendant's

---

[8] The choice of self-representation is not the only decision by an accused restricting issues cognizable on appeal. A guilty plea "severely restricts the defendant's right to appeal from the ensuing judgment" (*Chadd, supra*, 28 Cal.3d at p. 748), yet this court has never suggested that a defendant indicating a willingness to enter a guilty plea should or must be advised of this consequence. (See *In re Tahl* (1969) 1 Cal.3d 122, 132 [81 Cal.Rptr. 577, 460 P.2d 449]; *People* v. *Everett* (1986) 186 Cal.App.3d 274, 281-282 [230 Cal.Rptr. 604]; *In re Chadwick C.* (1982) 137 Cal.App.3d 173, 179-180 [170 Cal.Rptr. 798, 621 P.2d 837]; *People* v. *Watts* (1977) 67 Cal.App.3d 173, 184 [136 Cal.Rptr. 496].) We note also that the Sixth and Seventh Circuits have directed federal district judges to follow the model inquiry set forth in 1 Bench Book for United States District Judges (3d ed. 1986) 1.02-2 when faced with a request for self-representation; this model inquiry does not provide for an advisement that a pro se defendant cannot claim ineffective assistance of counsel on appeal. (*U.S.* v. *McDowell, supra*, 814 F.2d at p. 250; *U.S.* v. *Moya-Gomez* (7th Cir. 1988) 860 F.2d 706, 732, fn. 25.)

waiver of counsel in this case is not rendered invalid by the absence of an advisement regarding the appellate consequences of the waiver. Having expressly rejected full representation by a skilled professional, and having elected self-representation for the purpose of facilitating a death verdict, defendant could not reasonably have expected to obtain reversal of a judgment of death by asserting the ineffectiveness of his own unskilled efforts.

*Effective assistance of counsel.* ■ Defendants who have elected self-representation may not thereafter seek reversal of their convictions on the ground that their own efforts were inadequate and amounted to a denial of effective assistance of counsel. (*Faretta, supra*, 422 U.S. 806, 834-835, fn. 46 [45 L.Ed.2d 562, 581].) This rule applies whether or not the self-represented defendant has been assisted by an attorney acting as advisory counsel or in some other limited capacity. (See *Mullins* v. *Lavoie* (1982) 249 Ga. 411 [290 S.E.2d 472, 474]; *Carter* v. *State* (Ind. 1987) 512 N.E.2d 158, 163-164; *State* v. *Hutchison* (Iowa 1983) 341 N.W.2d 33, 42; *Parren* v. *State, supra*, 309 Md. 260 [523 A.2d 597, 599]; *State* v. *Harper* (Mo.App. 1982) 637 S.W.2d 170, 173-174.) This must be especially true when, as here, the course charted by the self-represented defendant is contrary to the advice of counsel. In the present case, defendant made a considered decision to pursue a strategy likely to result, and intended to result, in a death verdict. Having made that decision, having persuaded the trial court to grant him self-representation, and having conducted the penalty phase according to his own plan, defendant may not predicate error on his own actions.

■ Defendant argues that his trial attorney had an independent obligation to present an effective penalty defense on defendant's behalf. As noted, defendant's attorney acted in a limited and largely advisory capacity at the penalty phase. Once defendant requested and was granted self-representation, and assumed control of the defense case, his attorney was under no obligation to act in a manner directly contrary to defendant's express instructions.

To prevail on a claim that counsel acting in an advisory or other limited capacity has rendered ineffective assistance, a self-represented defendant must show that counsel failed to perform competently *within the limited scope of the duties assigned to or assumed by counsel* (see *People* v. *Hamilton, supra, ante*, pp. 1164-1165, fn. 14; *People* v. *Doane, supra*, 200 Cal.App.3d at pp. 864-866), and that a more favorable verdict was reasonably probable in the absence of counsel's failings (see *Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698, 104 S.Ct. 2052]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]). A self-represented defendant may not claim ineffective assistance on account of

counsel's omission to perform an act within the scope of duties the defendant voluntarily undertook to perform personally at trial.

As noted, defendant assumed complete control of the formulation and presentation of the defense case at the penalty phase with the objective of obtaining a death verdict. Presentation of mitigating evidence was not a duty that was assigned to or assumed by the attorney. Having assigned counsel a subordinate role which expressly precluded the selection or examination of penalty phase witnesses, defendant may not now predicate error on counsel's conduct in conformity with defendant's own wishes. (See *Frierson, supra*, 39 Cal.3d 803, 817 [". . . when a defendant insists on a course of action despite his counsel's contrary warning and advice, he may not later complain that his counsel provided ineffective assistance by complying with his wishes"]; see also, *Autry* v. *McKaskle* (5th Cir. 1984) 727 F.2d 358, 361 ["By no measure can [the capital defendant] block his lawyer's efforts and later claim the resulting performance was constitutionally deficient"]; *State* v. *Felde* (La. 1982) 422 So.2d 370, 395, cert. den. 461 U.S. 918 [77 L.Ed.2d 290, 103 S.Ct. 1903] [defense attorney permitted cocounsel defendant to testify to death verdict preference, offered no other penalty phase evidence, and argued for death verdict—ineffective assistance claim rejected].)

*Reliable verdict.* ■ Relying on *People* v. *Deere, supra*, 41 Cal.3d 353, defendant argues that permitting a defendant to withhold substantial mitigating evidence undermines the state's interest in reliable penalty determinations in capital cases. As we explain, the argument contains both practical and theoretical flaws. In brief, a rule requiring a self-represented defendant to present mitigating evidence would be unenforceable and self-defeating. For this and other reasons, a judgment of death may not be regarded as unreliable in a constitutional sense merely because a self-represented defendant chose not to present mitigating evidence at the penalty phase.

A rule requiring a pro se defendant to present mitigating evidence would be unenforceable, as the court has no means to compel a defendant to put on an affirmative defense. (See *Hamblen* v. *State, supra*, 527 So.2d at p. 804 ["there is no power that could have compelled [the defendant] to cooperate and divulge such information"].) The threat of appellate reversal would be not merely ineffective but counterproductive. A knowledgeable defendant desiring to avoid the death penalty could make a timely request for self-representation under *Faretta, supra*, 422 U.S. 806, and then decline to present any mitigating evidence at the penalty phase, secure in the knowledge that any death judgment would be reversed by this court, while a defendant genuinely desiring death could circumvent the rule by presenting a bare minimum of mitigating evidence. A rule so easily evaded or misused

is clearly unsound. The sanction of appellate reversal is not the answer, nor has any alternative method been suggested to compel an unwilling defendant to present an effective penalty defense.

While the United States Supreme Court has frequently stated that the Eighth Amendment and evolving standards of societal decency impose a high requirement of reliability on the determination that death is the appropriate penalty in a particular case (see, e.g., *Johnson* v. *Mississippi* (1988) 486 U.S. 578, 584 [100 L.Ed.2d 575, 584, 108 S.Ct. 1981, 1986]; *Mills* v. *Maryland* (1988) 486 U.S. 367, 377 [100 L.Ed.2d 384, 395, 108 S.Ct. 1860, 1870]), the high court has never suggested that this heightened concern for reliability requires or justifies forcing an unwilling defendant to accept representation or to present an affirmative penalty defense in a capital case. Indeed, the lack of any legal or practical means to force a pro se defendant to present mitigating evidence, or indeed any defense at all, compels the conclusion that the death-verdict-reliability requirement cannot mean that a death verdict is unsound merely because the defendant did not present potentially mitigating evidence. Rather, the required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements.[9] (See *Hamblen* v. *State, supra,* 527 So.2d 800, 804; *People* v. *Silagy, supra,* 101 Ill.2d at p. 181 [461 N.E.2d at p. 432]; see also, *State* v. *Harding* (1983) 137 Ariz. 278 [670 P.2d 383, 400] [self-represented defendant presented no mitigating evidence—judgment of death affirmed]; *Bishop* v. *State* (1979) 95 Nev. 511 [597 P.2d 273, 276] [same]; Bonnie, *The Dignity of the Condemned* (1988) 74 Va.L.Rev. 1363, 1382-1389.)

*Habeas corpus petition.* Defendant has filed a habeas corpus petition to supplement the trial record with a declaration by his trial counsel summarizing the available mitigating evidence, which primarily concerned parental abuse by Bloom, Sr., and defendant's resulting psychological trauma or borderline schizophrenia. The contention advanced in the petition is that

---

[9]This conclusion is consistent with our decision in *People* v. *Williams* (1988) 44 Cal.3d 1127, 1152 [245 Cal.Rptr. 635, 751 P.2d 901], stressing that failure to present mitigating evidence generally does not make a death judgment unreliable in a constitutional sense in the absence of misleading or erroneous instructions and argument. To the extent that *Deere, supra,* 41 Cal.3d 353, suggests that failure to present mitigating evidence in and of itself is sufficient to make a death judgment unreliable, it is based on a mistaken understanding of the Eighth Amendment's reliability requirement and its reasoning in that regard is hereby disapproved.

failure to present mitigating evidence at the penalty phase, in conjunction with defendant's argument to the jury requesting a death verdict, deprived him of his right to effective assistance of counsel and offended the state's interest in ensuring the reliability of death penalty verdicts. The reasons which caused us to reject this contention when raised on appeal compel its rejection in this context as well.

### B. *Adequacy of Sentencing Instructions.*

■■■ Defendant next argues that the court's instructions, coupled with the jury arguments, misled the jury regarding its obligation (1) to weigh and consider all mitigating evidence in the case (see *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813]), and (2) to determine the appropriate penalty for defendant based on that evidence (see *People* v. *Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440]).

The jury was expressly told that in deciding the penalty, it should consider all evidence in the case, including the guilt phase evidence. In addition, the jury was given a section 190.3 modified factor (k) instruction which advised the jury to consider "any other aspect of defendant's character or record that defendant proffers as a basis for a sentence less than death." Thus, the instructions made it clear that the jury was not to base its penalty decision solely upon the evidence elicited during the penalty phase.

Defendant suggests, however, that the jury arguments misled the jury into believing it should not consider the guilt phase evidence. Our review of the record indicates otherwise. The prosecutor never told the jury to ignore the guilt phase evidence; he merely observed that defendant "chose" not to present any mitigating evidence. Moreover, after reviewing the aggravating evidence arising from the three murders, the prosecutor referred to some guilt phase testimony by defendant, reminding the jury that "incidentally, you have to take into account the defendant introduced some testimony by way of defense in the guilt phase of his trial . . . ." The prosecutor repeated this admonition when he later urged the jury to "[r]eview the evidence at the guilt phase of the trial."

We conclude that neither the instructions nor the jury arguments misled the jury regarding its obligation to review all the evidence in the case, including the guilt phase evidence.

Defendant observes that the jury was instructed in the unadorned statutory language of section 190.3 that "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death." (Former CALJIC No. 8.84.2.) He suggests that these

instructions were inadequate to inform the jury that it had sole discretion to determine the appropriate penalty for defendant regardless of the numerical "count" of the applicable aggravating and mitigating factors. (See *People* v. *Brown, supra,* 40 Cal.3d at p. 541; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115].)

Our review of the record indicates the jury was not misled concerning the scope of its sentencing responsibilities. The prosecutor never mentioned the numerical count of the aggravating circumstances but simply reviewed the evidence, stressed defendant's lack of remorse, and explained that the jury had two choices, life without parole or death. The prosecutor urged the jury to apply the maxim that "the punishment should fit the crime," and in doing so to review the evidence, including the guilt phase evidence of defendant's background, in order to determine the "proper" punishment for defendant.

Defendant also observes that both the prosecutor and defendant argued to the jury that no mitigating evidence had been offered in the case. Defendant contends the jury might thereby have been misled into thinking that a death verdict was compelled by the mandatory language of the sentencing instruction. As previously indicated, however, our review of the record, including the instructions and argument, has persuaded us that the jury understood its obligation to consider the substantial mitigating evidence elicited at the *guilt* phase of the trial. Nothing in the record suggests that the jury ignored the mitigating evidence in making its penalty decision. On these facts, we conclude no error occurred here under *Brown, supra,* 40 Cal.3d 512.

### C. *Other-crimes Evidence.*

█ Defendant next contends that the court improperly permitted the jury to consider evidence of his other criminal acts which were assertedly irrelevant to the penalty determination and hence inadmissible at the penalty trial. Defendant refers to the evidence, previously discussed, regarding his arrest on charges of the attempted robbery of an elderly couple, and of carrying a concealed BB gun, including his statement that he would have shot one of the arresting officers had the officer not been standing behind the door of the police car.

Evidence that defendant had been arrested, but not charged, for attempted robbery was not admissible under section 190.3, factor (b). The evidence was clearly insufficient to establish that defendant in fact committed the offense for which he had been arrested. (See *People* v. *Anderson* (1978) 20 Cal.3d 647, 650 [143 Cal.Rptr. 883, 574 P.2d 1235].) However, this evi-

dence was elicited by defendant. Even if defendant could predicate error on the admission of evidence he elicited, the error could only be regarded as relatively minor and nonprejudicial, for no reasonable juror would vote for a death penalty merely because defendant had been arrested for, but not charged with, attempted robbery. Moreover, the jury was expressly instructed that it could not consider such evidence unless the *offense* (not merely the arrest) was proved beyond a reasonable doubt.

As for the evidence of defendant's concealed-weapon arrest and his subsequent statement about shooting at the officers, we may assume arguendo that none of this evidence involved prior violent criminal activity, and that accordingly it too was inadmissible. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 777 [215 Cal.Rptr. 1, 700 P.2d 782].) Again, however, it is not reasonably possible the jury's penalty verdict was affected by the disclosure that defendant had been arrested for carrying a concealed BB gun and had admittedly considered firing it at the officers. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

D. *Reasonable Doubt as to Weight of Sentencing Factors.*

Defendant contends the jury should have been instructed that, in order to impose death, it must find beyond a reasonable doubt that the aggravating factors outweighed the mitigating ones. The contention is without merit. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 107.)

E. *Double Counting of Sentencing Factors.*

Defendant complains of possible double counting of sentencing factors by reason of instructions which allowed the jury to consider both the circumstances of the present offense (§ 190.3, factor (a)) and the presence of criminal activity (*id.,* factor (b)). Although the latter factor refers to *prior* criminal activity other than the charged offenses, there is no indication in the record that the prosecutor urged the jury to give undue weight to the circumstances surrounding the charged offenses or that the jury was misled in this regard. (See *People* v. *Thompson* (1988) 45 Cal.3d 86, 137-138 [246 Cal.Rptr. 245, 753 P.2d 37]; *People* v. *Melton* (1988) 44 Cal.3d 713, 763 [244 Cal.Rptr. 867, 750 P.2d 741].)

F. *Excessive Multiple-murder Special-circumstance Findings.*

Although defendant has not raised the point, the court erred in permitting the jury to find and consider three multiple-murder special circumstances instead of one. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1150 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People* v. *Allen, supra,* 42 Cal.3d

1222, 1273.) Accordingly, only one multiple-murder special circumstance should have been considered by the jury during the penalty phase.

The instructions, however, did not permit consideration of any evidence that was not otherwise admissible and relevant to the penalty decision. The jury was fully aware that defendant committed three murders in the present case, and that the multiple-murder special circumstances were based on these murders. Accordingly, we find the error harmless. (See *Allen, supra,* 42 Cal.3d at pp. 1281-1283.)

G. *Cumulative Effect of Penalty Phase Errors.*

Defendant asserts that the cumulative effect of the various errors discussed above should require reversal of the penalty. As we have seen, few errors were committed, and they were too minor, separately or in combination, to have affected the verdict.

The judgment of guilt, the finding of one multiple-murder special circumstance, and the judgment of death are affirmed. The petition for writ of habeas corpus is denied.

Panelli, J., Eagleson, J., and Arguelles, J.,* concurred.

LUCAS, C. J.—I concur in the judgment of death, but I would reach that disposition in a slightly different manner than the majority.

In rejecting defendant's incompetent counsel claims, the majority concludes, based on its reading of *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], that (1) defendant was properly allowed to represent himself (with advisory counsel) despite his stated purpose to withhold mitigating evidence and obtain a death verdict, and (2) he was not entitled to a specific, advance warning that such self-representation would result in the waiver of his right to raise on appeal any claims of incompetent counsel.

Although I tend to agree with the foregoing conclusions, the lack of supportive federal precedent would lead me to base our decision on the ground that, in any event, defendant was not prejudiced by any supposed error in permitting him to proceed as he did. (I assume that any error in allowing self-representation with cocounsel or advisory counsel would not be deemed reversible per se. Cf. *People* v. *Crandell* (1988) 46 Cal.3d 833,

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

864-865 [251 Cal.Rptr. 227, 760 P.2d 423]; *People* v. *Bigelow* (1984) 37 Cal.3d 731, 744-746 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], and cases cited.)

Here, defendant introduced substantial mitigating "background" evidence at the guilt phase, which evidence focused on his unstable relationship with his abusive father, his initial murder victim. The guilt phase evidence included testimony by defendant's mother, grandmother, former stepmother and other witnesses regarding Bloom, Sr.'s violent temper and his physical and verbal abuse of defendant, and the testimony of Dr. Kling regarding defendant's schizotypal mental disorder. Additionally, the jury knew that defendant had no prior felony convictions and was only 18 years old when he committed the offenses.

Although the foregoing evidence was not formally presented or argued at the penalty phase, the jury was expressly instructed to consider, in determining penalty, "all of the evidence which has been received during any part of the trial of this case, *including the guilt phase*." (Italics added.)

In addition, expanded jury instructions were given in the present case to make clear that the jury could consider "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and *any other aspect of defendant's character or record* that defendant proffers as a basis for a sentence less than death." (Italics added.)

At one point in his argument the prosecutor reminded the jury that defendant "chose" not to present any mitigating evidence. Soon thereafter, however, the prosecutor advised the jury to "Go over the facts in this case, go over the defendant's background, see how he only goes after those who are unarmed and helpless. *Review the evidence of the guilt phase of the trial*." (Italics added.) Thus, contrary to defendant's contention, we must assume from the instructions and argument in this case that the jury considered the substantial mitigating evidence elicited at the guilt phase. (See *People* v. *Rich* (1988) 45 Cal.3d 1036, 1117-1119 [248 Cal.Rptr. 510, 755 P.2d 960]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1152 [245 Cal.Rptr. 635, 751 P.2d 901]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1214 [240 Cal.Rptr. 666, 743 P.2d 301].)

Here, the jury received expanded instructions which permitted it to consider the mitigating guilt phase evidence. Thus, defendant's failure to formally introduce any mitigating evidence at the penalty phase was not prejudicial to his case. For the same reason, defendant's habeas corpus petition fails to state a prima facie case. The mitigating evidence referred to in the petition appears to be largely cumulative of evidence already admitted at

the guilt phase. (See *People* v. *Guzman* (1988) 45 Cal.3d 915, 968-969 [248 Cal.Rptr. 467, 755 P.2d 917]; *Williams, supra,* 44 Cal.3d at p. 1152.)

Moreover, the aggravating evidence which defendant helped the prosecutor present was fairly insubstantial (testimony concerning an arrest for a prior unadjudicated attempted robbery) when compared with the other aggravating circumstances in the case. Finally, even if defendant had not been allowed to represent himself, he still would have had the right to address the jury and request a death sentence. (See *Guzman, supra,* 45 Cal.3d at p. 962.)

Thus, I would conclude that the grant of self-representation with cocounsel or advisory counsel did not substantially affect the course or outcome of the penalty trial. Under the circumstances here, I agree that the judgment of death should stand.

**MOSK, J.,** Concurring and Dissenting.—I concur in the affirmance of the judgment convicting defendant of the willful, premeditated, and deliberate murder of his father. I also concur in the upholding of the determination of death-eligibility.

I dissent, however, from the affirmance of the judgment convicting defendant of the willful, premeditated, and deliberate murder of his stepmother and stepsister. As I shall explain, the evidence is insufficient to support the jury's verdict of guilty as to these two offenses—specifically, it is insufficient on the elements of premeditation and deliberation.

I also dissent from the affirmance of the judgment imposing the penalty of death. As I shall explain, the trial court erred by granting a request by defendant to prosecute the case for death at the penalty phase of this capital trial. The error requires reversal: it resulted in a breakdown of the adversary process and thereby rendered the jury's verdict of death unreliable as a matter of law.

I

I turn first to the issue whether the evidence is sufficient to support the jury's verdict finding defendant guilty of the willful, premeditated, and deliberate murder of his stepmother and stepsister.

When a court assesses the sufficiency of the evidence, its "task is to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt. [Citation.] The judgment must be supported by 'substantial evidence,' which has been defined as evidence that 'reasonably inspires

confidence and is of "solid value." ' " (*People* v. *Morris* (1988) 46 Cal.3d 1, 19 [249 Cal.Rptr. 119, 756 P.2d 843] (per Kaufman, J.).) The term "substantial evidence," of course, means solid *evidence* and not mere speculation. In any given case, a court "may *speculate* about any number of scenarios that may have occurred . . . . A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." (*Id.* at p. 21, italics in original, internal quotation marks and paragraphing omitted.)

In *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], this court stated: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (70 Cal.2d at pp. 26-27, italics in original.)

In my view, it is plain that a rational trier of fact should not have found defendant guilty beyond a reasonable doubt of the premeditated and deliberate murder of his stepmother and stepsister: premeditation and deliberation were not proved beyond a reasonable doubt. Indeed, the evidence of these two elements is practically nonexistent, and was certainly far too insubstantial to support a finding *beyond a reasonable doubt*: at most, the record supports an inference that the killings resulted from an explosion of violence without significant forethought or reflection on the part of defendant.

Specifically, there is no substantial evidence that defendant planned his attack on his stepmother and stepsister. The majority cite testimony to the effect that after shooting his father, defendant "reload[ed] the rifle, or adjust[ed] or inspect[ed] it in some manner, and then enter[ed] the residence" and killed his stepmother and stepsister. (Maj. opn., *ante,* at p. 1210.) Such testimony may perhaps allow speculation that defendant planned the later killings. But "speculation" is not "evidence," less still "substantial evidence."

Next, there is no substantial evidence that defendant had a motive to kill his stepmother and stepsister. The majority evidently accept an elimination-of-witnesses theory presented by the Attorney General. But the Attorney General himself admits in his brief that this theory is "merely speculation." As stated above, "speculation" is not "evidence."

Finally, there is no substantial evidence that defendant employed a manner of killing his stepmother and stepsister that indicates a preconceived design to kill in a certain way. The majority expressly find that "The manner in which defendant killed [his stepmother] was . . . particular and exacting" (maj. opn., *ante,* at p. 1210), and impliedly find that the manner in which he killed his stepsister was similar. The record, however, reveals no substantial evidence of a "particular and exacting" manner of killing. I recognize that defendant's conduct arguably supports an inference of intent to kill. But such an intent, of course, does not amount to or entail premeditation or deliberation in and of itself. (See *People* v. *Anderson, supra,* 70 Cal.2d at p. 26.)

Therefore, I would hold that the evidence is insufficient to support the jury's verdict finding defendant guilty of the willful, premeditated, and deliberate murder of his stepmother and stepsister.

## II

I turn next to the issue whether the trial court committed reversible error when it granted defendant's request to prosecute the case for death at the penalty phase of his capital trial.

Manifestly, the penalty phase of a capital trial in this state is an adversary process. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective" of punishment in accordance with deserts. (*Herring* v. *New York* (1975) 422 U.S. 853, 862 [45 L.Ed.2d 593, 600, 95 S.Ct. 2550]; accord, *United States* v. *Cronic* (1984) 466 U.S. 648, 655 [80 L.Ed.2d 657, 665, 104 S.Ct. 2039].) In other words, "The system assumes that adversarial testing

will ultimately advance the public interest in truth and fairness." (*Polk County* v. *Dodson* (1981) 454 U.S. 312, 318 [70 L.Ed.2d 509, 516, 102 S.Ct. 445].) It follows that the system requires "meaningful adversarial testing." (*United States* v. *Cronic, supra*, 466 U.S. at p. 656 [80 L.Ed.2d at p. 666].) When such testing is absent, the process breaks down and hence its result must be deemed unreliable as a matter of law. (See *id*. at p. 659 [80 L.Ed.2d at p. 668]; see also *Rose* v. *Clark* (1986) 478 U.S. 570, 577-578 [92 L.Ed.2d 460, 470-471, 106 S.Ct. 3101] [to similar effect]; *Satterwhite* v. *Texas* (1988) 486 U.S. 249, 256-257 [100 L.Ed.2d 284, 293-294 108 S.Ct. 1792, 1797] [impliedly following the *Rose* analysis].)

Further, as the United States Supreme Court has repeatedly emphasized, "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (opn. of Stewart, Powell, and Stevens, JJ.); accord, *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 329-330 [86 L.Ed.2d 231, 239-230, 105 S.Ct. 2633]; *California* v. *Ramos* (1983) 463 U.S. 992, 998-999, fn. 9 [77 L.Ed.2d 1171, 1178-1180, 103 S.Ct. 3446], citing cases.)

Immediately after the jury returned its verdict at the guilt phase, defendant addressed the trial court as follows. "Your Honor, I would just like to say now that I have been through the convicted—it is not fair. I feel that having just filed it, it might be that I would like for [defense counsel] as my co-counsel, and the reason I want to go pro[.] per[.] is so that—see, I don't want to put up no defense, because really it is counterproductive. [¶] The jury has already sentenced me to death. You know what I'm saying? [¶] All they got to do now is tell me whether I die of natural causes or whether they send it up by the chamber, and it don't make no never-mind to me except for the fact that I'm only 20 years old, and I really can't picture myself, you know, life without parole means life without—unless you get a clemency from the Governor, and I really don't see that happening. [¶] I really don't want to put on a defense. I just want to be able to address the jury and, you know, seek the death penalty myself, because I really don't intend spending the rest of my natural life in some institution, you know, and I would have—I would like to, you know, address the jury and, you know, whatever, but I would like to do this in the capacity of pro[.] per[.] so that the prosecution is going to seek the death penalty. That's cool. [¶] All right. I'm going to help him."

Defendant subsequently made it clear that he desired to put on a case for death independent of the prosecution: he acknowledged that he "intend[ed] to call such witnesses which would aid the prosecution in obtaining the death penalty."

The trial court recognized defendant's intent. When defendant requested a continuance and law library privileges in order to prepare his case, the following colloquy ensued.

"THE COURT: It is a unique situation, a unique problem that is presented to this court. [¶] I have to tell you that it is not my intention to grant you a continuation, continuation of the penalty phase for that purpose.

"THE DEFENDANT: How can I go up against a man who has been practicing law longer than I have been alive?

"THE COURT: It doesn't sound like you are going against him. He is not arguing for life. He is arguing for death. [¶] What you are doing is concurring with the position the People are taking."

In my view, the trial court plainly erred when it granted defendant's request to prosecute the case for death.

As stated above, the penalty phase of a capital trial in this state is an adversary process and the Constitution requires heightened reliability as to its outcome. A defendant has no right to attempt to subvert the process and thereby undermine the reliability of its result, and a court has no power to allow him to do so. (See, e.g., *People* v. *Deere* (1985) 41 Cal.3d 353, 362-364 [222 Cal.Rptr. 13, 710 P.2d 925] [holding that the state has a strong independent interest in the reliability of the penalty determination in a capital case]; *People* v. *Chadd* (1981) 28 Cal.3d 739, 749-753 [170 Cal.Rptr. 798, 621 P.2d 837] [to similar effect]; *People* v. *Stanworth* (1969) 71 Cal.2d 820, 832-834 [80 Cal.Rptr. 49, 457 P.2d 889] [to similar effect]; see also *People* v. *Guzman* (1988) 45 Cal.3d 915, 960-961 [248 Cal.Rptr. 467, 755 P.2d 917] [impliedly approving the *Deere* holding]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1149-1152 [245 Cal.Rptr. 635, 751 P.2d 901] [same]; *People* v. *Burgener* (1986) 41 Cal.3d 505, 541-543 [224 Cal.Rptr. 112, 714 P.2d 1251] [following *Deere*].) Thus, the trial court errs when it permits a defendant to try to subvert the adversary process and undermine its reliability indirectly through counsel. (See *People* v. *Deere, supra*, 41 Cal.3d at pp. 368-370 (conc. opn. of Broussard, J.).) Consequently, it errs when it permits him to seek the same goal directly through his own efforts.

In this case, the trial court was obligated to deny defendant's request to prosecute the case for death in order to preserve the integrity of the adver-

sary process and thereby safeguard the reliability of its outcome. It failed to do so. It thereby committed error.

In arriving at the contrary conclusion, the majority rely on *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. As will appear, their reliance is misplaced: the trial court's ruling was not compelled by *Faretta,* nor was it even consistent with the logic of that decision.

In *Faretta,* the United States Supreme Court held that "The Sixth Amendment . . . grants to the accused personally the right to make his defense." (422 U.S. at p. 819 [45 L.Ed.2d at p. 572].) In support the court cited, inter alia, the "nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." (*Id.* at p. 817 [45 L.Ed.2d at p. 572].) It defined "the right to self-representation" as the right "to make one's own defense personally." (*Id.* at p. 819 [45 L.Ed.2d at p. 572].) It observed that "the [Sixth] Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it." (*Id.* at p. 818 [45 L.Ed.2d at p. 572].)

In *McKaskle* v. *Wiggins* (1984) 465 U.S. 168 [79 L.Ed.2d 122, 104 S.Ct. 944], the court made express what it had clearly implied in *Faretta*. "[T]he defendant's right to proceed *pro se* exists in the larger context of the criminal trial designed to determine whether or not a defendant is guilty of the offense with which he is charged." (*Id.* at pp. 177-178, fn. 8 [79 L.Ed.2d at p. 133].)

Thus, viewed within this context the right of self-representation has as at least one of its purposes the safeguarding of the criminal trial as a proceeding that is adversarial not merely in name but also and especially in substance. (See *Faretta* v. *California, supra*, 422 U.S. at pp. 812-834 [45 L.Ed.2d at pp. 569-581].)

I return to the case at bar. To begin with, the record shows that defendant did not have a right to prosecute the case for death under *Faretta*.

As stated above, under *Faretta* a criminal defendant has a "basic right to defend himself if he truly wants to do so" (*id.* at p. 817 [45 L.Ed.2d at p. 572]), a "right to make a defense as we know it" "in an adversarial criminal trial" (*id.* at p. 818 [45 L.Ed.2d at p. 572]). He does not have a right to

prosecute himself. Defendant, of course, did not seek to mount a defense, but rather desired to direct an independent prosecution.

As also stated above, at least one of the purposes of the right of self-representation is to safeguard the trial as an adversary proceeding. Defendant, however, invoked this right *not* to participate directly in the process but rather to destroy it with his own hands and make the penalty phase what it turned out to be—a sham and a mockery of justice.

But in any event, even if defendant could have invoked the authority of *Faretta* in support of his request to prosecute the case for death, he did not effectively do so here. The reasons are plain. The request seems too little. When the motion is scrutinized in the context in which it was made and not in light of subsequent events, it appears to seek cocounsel status and not self-representation properly so-called. (See *People* v. *Wheeler* (1977) 68 Cal.App.3d 1056, 1059 [137 Cal.Rptr. 791].) The request, however, was certainly too late. The motion was not made prior to trial, but only shortly before the opening of the penalty phase. (See *People* v. *Hamilton* (1988) 45 Cal.3d 351, 369 [247 Cal.Rptr. 31, 753 P.2d 1109].)

In short, the granting of defendant's request to prosecute the case for death is not supported by *Faretta* and is indeed inconsistent with the logic of that decision. *Faretta* is a shield for the criminal defendant; he may use the right of self-representation to defend himself and preserve the adversary process. (See *id.*, 422 U.S. at pp. 818-834 [45 L.Ed.2d at pp. 572-581].) *Faretta*—contrary to the majority's apparent view—is not a sword for the defendant; he may not use the right of self-representation to prosecute himself and undermine the adversary process. (See *id.* at pp. 834-835, fn. 46 [45 L.Ed.2d at p. 581].) As the *Faretta* court itself stated: "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." (*Id.* at p. 835, fn. 46 [45 L.Ed.2d at p. 581].) A fortiori, the right of self-representation is not a license to subvert the very adversary process of which it is but one part.

In holding that the trial court did not err by granting defendant's request to prosecute the case for death, the majority also appear to conclude that the ruling was not inconsistent with the nature of the penalty phase as an adversary process or the constitutional requirement of heightened reliability for the penalty determination. I cannot agree.

First, the court's ruling left the penalty phase unprotected in the face of the direct attack defendant openly set out to mount against the adversary process. The majority seem to say the court took steps to safeguard the formal characteristics of the process. But it manifestly took no steps whatever to preserve its substance. And as explained above, it is the substance and not the formal characteristics that is critical here. The majority also seem to say the court could not have done more than it did. I disagree. It may well be the court could not have compelled defendant to put on a meaningful case for life. But it could perhaps have appointed independent counsel to put on such a case—and it certainly could have barred defendant from prosecuting a case for death.

Second, the court's ruling permitted, if not invited, the undermining of the reliability of the penalty determination at defendant's hands. As explained above, whether the outcome of the penalty phase is reliable turns on the presence of "meaningful adversarial testing." (*United States* v. *Cronic, supra,* 466 U.S. at p. 656 [80 L.Ed.2d at p. 666].) The court, however, allowed the penalty phase to degenerate—as degenerate it did—into a proceeding in which there would be no "adversarial testing," "meaningful" or otherwise.[1]

I turn now from the fact of error to its consequences. In my view, on these facts reversal is required without consideration of the existence *vel non* of specific prejudice. As the record establishes beyond peradventure, the error resulted in a breakdown of the adversary process and thereby rendered the jury's verdict unreliable as a matter of law.

At the penalty phase the prosecution presented in aggravation evidence that defendant had attempted with a pellet gun to rob an elderly woman at a church. At a bench conference, defendant made the following complaint: "in my opinion, [the prosecutor] is not bringing out nothing aggravating. His job is to bring out aggravating circumstances. He's talking about this one robbery. There is another robbery where people were shot. If he's not

---

[1] By acting as it did—the majority's assertion to the contrary notwithstanding—the trial court also contravened the policy against state-aided suicide. As this court stated in *People* v. *Deere, supra,* 41 Cal.3d 353: "If the question is whether this defendant may elect to sacrifice his life to atone for the murders he committed, the answer is affirmative. While at common law suicide was a felony punishable by forfeiture of property to the king and ignominious burial, there is nothing in modern law to prevent a person from resolving or attempting to end his life. [Citation.] Indeed, there is a body of law evolving that appears to respect a person's choice of how and when to die. [Citation.] [¶] *However, if the question is whether a person may compel the people of the State of California to use their resources to take his life, the answer must be negative.*" (*Id.* at pp. 361-362, italics added.)

going to call them, I will call them." The prosecutor responded: "There is evidence the defendant attempted to commit another robbery. However, the victim in that case, from what I am able to read from the reports, cannot identify the defendant, therefore we cannot bring him in." Defendant replied: "I'll stipulate [to identity]." Defense counsel, however, would not join in the proposed stipulation and the prosecutor refused to accept the offer. During cross-examination of one of the prosecution's witnesses, defendant elicited testimony to the effect that he was a suspect in an attempted robbery of an elderly couple during which some type of handgun was apparently fired.

The prosecution also presented evidence that defendant had been arrested by two police officers for carrying a concealed weapon—a pellet gun—and that he stated to one of the officers after his arrest that "if he had a choice, he would have gone ahead and shot one of us . . . ." During cross-examination of one of the prosecution's witnesses, defendant elicited testimony that when he was arrested he had in his possession a "robbery kit," including a carton of 1,500 pellets.

The defense presented no evidence whatever in the penalty phase. Defendant had requested permission from the court to introduce photographs of the victims in death. The prosecutor stated: "I never brought [the photographs], never intended to bring them into evidence, so the court has never seen them nor have I ever intended to offer them in evidence. [¶] I felt they would have been inflammatory and the court wouldn't put them in evidence anyway." The court denied defendant's request.

In his closing argument, the prosecutor asked for the death penalty, arguing there was no evidence in mitigation: "The defendant had an opportunity, if he so chose to do, he could have presented factors in mitigation. You heard none"; and, "He had the right to show you, if there was any factors in mitigation, he could have presented testimony. He chose not to do so."

In his closing argument, defendant also asked for the death penalty, arguing there was no evidence in mitigation: "I didn't offer no mitigating circumstances, because there ain't no mitigating circumstances. There ain't none." Moreover, he developed a theme, which he stated time and again, to the effect that he would eventually get out of prison if he were sentenced to a term of life without possibility of parole. For example, at one point he said: "Let me talk a little about life without possibility of parole. [¶] People

throw that term around like it means something. I'm going to tell you something. It don't mean nothing. [¶] I can't find it right now, but I think you will find that life without possibility of parole can be modified in the future. This is California. People get out." At another point he stated: "I'll tell you something, I'll be out." Finally, he said: "Give me life and I'll kill again, in prison."

At a bench conference, defendant asked the trial court to deliver the discredited "Briggs Instruction" (see *People* v. *Ramos* (1984) 37 Cal.3d 136, 150-159 [207 Cal.Rptr. 800, 689 P.2d 430]) in an evident attempt to support the "I'll get out" theme of his argument. The court denied the request.

In view of the foregoing it is evident that there was no "adversarial testing" at the penalty phase, "meaningful" or otherwise. The "defense"—if such it can be called—did not merely fail to participate in the proceedings in accordance with its role to—at the very least—" 'put the State to its proof' " (*People* v. *Chadd, supra*, 28 Cal.3d 739, 750, fn. 7). Rather, it actually aided the state by presenting an independent case for death, including aggravating evidence that the state had chosen not to present as unreliable.

It must be emphasized that contrary to the majority's suggestion, the jury was not given instructions sufficient to repair the breakdown of the adversary process at the penalty phase—if indeed any such instructions could have been given.

It is true that at the guilt phase there was presented considerable evidence concerning defendant's background and character that was potentially mitigating. It is also true that the trial court told the jurors that "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, *including the guilt phase*." (Italics added.)

These facts, however, do not undermine my conclusion. To begin with, I have serious doubt that the jurors were effectively informed of their obligation to consider the potentially mitigating evidence presented at the guilt phase. To be sure, the court told them that in determining penalty they should take into account "any . . . aspect of defendant's character . . . *that defendant proffers* as a basis for a sentence less than death." (Italics added.) But as stated above, defendant did *not* proffer any such evidence. Further,

both defendant and the prosecutor forcefully argued that no such evidence existed in the record. In any event, the jurors received insufficient guidance as to how they might consider the potentially mitigating evidence. Plainly, evidence does not declare its own weight and significance. (See *Herring* v. *New York, supra*, 422 U.S. at pp. 856-864 [45 L.Ed.2d at pp. 597-602] [discussing the constitutionally fundamental importance of closing argument in the adversary process].) The jurors did not receive guidance on the consideration of potentially mitigating evidence from both a prosecution and a defense perspective. Rather, they were told by both the prosecutor and defendant that there was no such evidence for them to consider.[2]

Accordingly, I believe that the trial court's erroneous grant of defendant's request to prosecute the case for death resulted in the breakdown of the adversary process and thereby rendered the jury's verdict unreliable as a matter of law. The majority appear to be of the view that reliability is assured in this case because various formal characteristics of the adversary process are evident. But to my mind there is no blinking the fact that the substance of that process was altogether lacking. And it is the substance that is critical.

The concurring opinion takes the position that the erroneous grant of defendant's request to prosecute the case for death was harmless. For the reasons stated above, I cannot conclude that the error is subject to harmless-error analysis under even the most stringent of standards. But even if I could, I would not be able to find an absence of prejudice.

The issue of penalty must be considered close. The evidence in aggravation, to be sure, was substantial. But "substantial" too—as both the majori-

---

[2] It is not altogether clear whether defendant's express "death wish" was sincere. I recognize that when he was being examined by a psychiatrist for a competency hearing after the penalty phase but before sentencing, defendant "admitted" he had sought the death penalty not to end his life but to expedite appeal to this court in the hope of reversal of the judgment in its entirety. I find it difficult to credit defendant's "admission": it is plainly inconsistent with the considerable delay defendant caused in the proceedings.

It is abundantly clear, however, that defendant reveled in the attention he received during his trial. In exploiting his own vices, he was much like Theodore Bundy, the condemned murderer who received vast news coverage throughout the country before his execution in early 1989. Several years ago, United States District Judge Gerhard Gesell chose to impose a sentence of life imprisonment on the killer of two agents of the Federal Bureau of Investigation rather than death. He explained: " 'It would not serve the ends of effective justice to allow the defendant the luxury of all the special attention a capital penalty would generate. His mistaken views of his own importance would be fed by the continued controversy and supplications surrounding the current legal controversy on the matter of capital punishment. [Defendant], you will die in jail, but at such time as God appoints.' " (Quoted in Dershowitz, *Executions Embolden Fame-seeking Killers,* S.F. Chronicle (Feb. 2, 1989) p. A23, col. 4.)

ty (maj. opn., *ante,* p. 1230) and the concurring opinion (conc. opn. of Lucas, C. J., *ante,* pp. 1233, 1234) concede—was the evidence in mitigation. The error considered here resulted in the maximization of the former evidence and the minimization of the latter, and thereby affected the balance of aggravating and mitigating circumstances to defendant's prejudice. Accordingly, I believe that on the present record the error here cannot be deemed harmless under any standard.

In coming to the opposite conclusion, the concurring opinion asserts that "the aggravating evidence which defendant helped the prosecutor present was fairly insubstantial . . . when compared with the other aggravating circumstances in the case." (Conc. opn. of Lucas, C. J., *ante,* p. 1234.) But this additional evidence—that defendant was a suspect in an attempted robbery of an elderly couple during which some type of handgun was apparently fired—cannot properly be labeled "fairly insubstantial." In the abstract, perhaps, such evidence might not be considered particularly weighty. But in this case it must be: the attempted robbery of the elderly couple was clearly more serious than either of the two crimes presented by the prosecution.

The concurring opinion also asserts that "even if defendant had not been allowed to represent himself, he still would have had the right to address the jury and request a death sentence." (Conc. opn. of Lucas, C. J., *ante,* p. 1234.) But although it is true that "the accused has a fundamental right to testify in his own behalf" at the penalty phase of a capital trial (*People* v. *Guzman, supra,* 45 Cal.3d at p. 962), surely defendant could not have said as a witness all that he said as counsel. For example, he could not have testified, as he did in fact argue, that the penalty of life imprisonment without possibility of parole did not *really* mean life imprisonment *without possibility of parole.*

Finally, the concurring opinion asserts that the instructions adequately informed the jurors that in determining penalty they should consider the potentially mitigating evidence introduced at the guilt phase. But as the discussion above demonstrates, the instructions did no such thing.

Accordingly, I would hold that the trial court committed reversible error when it granted defendant's request to prosecute the case for death at the penalty phase of his capital trial.

### III

For the foregoing reasons, I would reverse the judgment convicting defendant of the first degree murder of his stepmother and stepsister. I would also reverse the judgment of death.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied August 31, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.