Filed 6/8/21  P. v. Sansing CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BENJAMIN ERIC SANSING,<br><br>Defendant and Appellant. | C088533<br><br>(Super. Ct. No. 18FE012224) |

On June 22, 2018, at approximately 6:30 a.m., defendant attempted to enter S.F.'s house on Meadowview Road in Sacramento County through several windows.  After police arrested defendant, they found one window screen on the ground that had been removed from a kitchen window.  Later, S.F. found a portion of another screen that had been cut from a window on a door leading into the garage.

A jury found defendant guilty of one count of first degree residential burglary and found true the allegation that, during the commission of the offense, another person, other

1

than an accomplice, was present in the residence during the commission of the burglary. The trial court sentenced defendant to the midterm of four years.

On appeal, defendant asserts (1) the evidence was legally insufficient to support the jury's verdict because there was not substantial evidence he removed or cut any window screen, (2) the trial court erred in failing to instruct the jury, sua sponte, on the lesser included offense of attempted residential burglary, and, (3) relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1175 (*Dueñas*), that the trial court violated his due process rights in imposing fines and fees without first conducting an ability to pay hearing.

We affirm.

## FACTS AND HISTORY OF THE PROCEEDINGS

An amended information charged defendant with a single count of first degree residential burglary (Pen. Code, § 459 [statutory section references that follow are to the Penal Code unless otherwise stated]). The information further alleged that, during the commission of the offense, another person, other than an accomplice, was present in the residence during the commission of the burglary, within the meaning of section 667.5, subdivision (c)(21).

### The Prosecution Evidence

S.F. lived in a house she rented on Meadowview Road in Sacramento County. The house had a backyard that was enclosed by a wooden gate locked with a padlock. The windows of the house had slide locks, and most of them also had an additional screw lock "that prevents it from being jimmied open." The windows were almost all covered with blinds, pillowcases, and, in one case, a shower curtain.

S.F. arrived home from work at approximately 2:00 a.m. on the morning of June 22, 2018. S.F. went into the kitchen and took her dog out a kitchen door into the backyard. She did not notice anything unusual in the backyard. Asked if she observed

2

the house windows when she was in the backyard, S.F. responded that everything appeared to be intact. "In other words, the screens were still on the windows. The windows were still closed." She testified "it would have been blatantly obvious if they weren't" intact "because I come out through the interior door off of the kitchen and I exit through this rear door and usually stand right here (indicating) . . . ."

At approximately 6:30 a.m., S.F. was startled awake by her dog. The dog, a service dog, was "trained not to always bark." Instead, the dog jumped on S.F.'s legs. The dog stood up, her ears perked up, listening. S.F. heard someone near the front of the house. Alarmed, S.F. got up.

S.F. heard someone wrestling with the iron security door at the front of the house. She then heard "tapping, like knocking at the windows." S.F. looked out the peephole and saw defendant on her porch. Defendant was "going back and forth, looking in the windows." S.F. did not see anything in defendant's hands, but she also testified that she "honestly didn't take note of his hands" because she "was really nervous." Defendant then went out of view in the direction of the garage.

S.F. then heard a very loud bang. S.F. "knew by the bang that he had busted the gate open." By that time, S.F. was on the phone with 911.

While she was on the phone with 911, S.F. moved from window to window, watching what defendant was doing. S.F. described much of what she was observing to the 911 operator. S.F.'s 911 call was played for the jury.

S.F. reported that a man was banging on her door, she did not respond, and the man went to her side gate, kicked it open, and went into the backyard. S.F. reported the man was still in her backyard. S.F. repeated to the 911 operator more than once that the man remained in her backyard. S.F. reported that she did not see any weapons.

Looking out her master bedroom window into the backyard, S.F. could see the casita (also referred to as a studio and a shed) that was used for storage. A separate entrance in the structure led to a full bath and shower. On the interior, there was a barrier

3

wall between the storage area of the casita and the bathroom area; on the interior, one could not access the storage area from the bathroom. The storage area was locked, but defendant went into the bathroom, went through the bathroom cabinets, and went back and forth trying to gain access to the storage area. Defendant took items that were in the bathroom portion of the casita, including a five-gallon Home Depot bucket "and some other things." Asked if defendant was holding anything in his hands during this time, S.F. responded that she did not "recall specifically like taking note of his hands. I was really afraid, and he was going back and forth. And then at some point I saw him remove some things from the bathroom."

At some point S.F. stopped watching defendant from the master bedroom window. Four minutes 30 seconds into the 911 call, S.F. reported the man was still in her backyard. S.F. and the 911 operator did not communicate for approximately 40 seconds. Then, five minutes 17 seconds into the call, S.F. reported: "Yeah, I'm not watching him in the back of the house anymore, I'm at the front of my house." S.F. testified: "in my mind, it seemed like it was taking a really long time for local PD to respond. And I was afraid, and so I went back to check to see if they had arrived yet." Thus, she went from the master bedroom in the back to the front of the house to see if police had arrived yet. S.F. and the 911 operator did not communicate for the next one minute 13 seconds, until the 911 operator asked if there was somebody at the house with S.F. The 911 operator then asked S.F. if the man had come out past her in the front yard, and S.F. responded that he had not.

About 10 seconds later, seven minutes into the 911 call, S.F. said, "Oh, my God, he's at my fucking window." S.F. had just returned from the front of the house to the kitchen window to peer out to see where defendant was. And defendant was "right there" in one of the kitchen windows trying to enter the main house. S.F. testified: "This is the kitchen window that I -- when I came back from checking to see if PD had arrived yet. I

4

was peeking -- I have a covering over it. I went to peek through the side, and [defendant] was standing right there, and it startled me."

S.F. reported to the 911 operator that the man was trying to open the kitchen window. S.F. testified defendant had removed a screen, which she did not see him do, and she saw him attempting to open the window with his hands. S.F. testified: "I know he removed the screen from this window (indicating), and there were fingerprints on the window from the outside. So at some point he had tried to open that one. [¶] But I did see him try to open this, and he inevitably opened this one (indicating). He was trying to gain access from -- by any means necessary." S.F. testified that window did have a screw on it. Defendant had removed the screen, but he could not manage to jimmy the window open.

Asked if she saw him holding any tools in his hand when she saw him at the window, S.F. responded, "I was terrified. I don't recall specifically looking for tools or weapons." She testified, "I was at the point that I realized he was right there, and I was startled. I think I lost my composure. I was afraid."

With regard to another window, S.F. testified: "This is the garage entry door (indicating). There is an additional interior door to the house. But this has a slide-up window. And [defendant] cut the screen off of the window and proceeded to push that window up and open." S.F. did not see defendant cut the screen. She did see him slide the window up.

Defendant "kept going back and forth, trying to find some way to enter." S.F. testified on cross-examination that he attempted to enter her house through at least three windows. Asked about this again, S.F. testified: "I physically saw him at least with these two, the garage door entry window and the one right next to it. [¶] I did not actually see him at the kitchen window because that's when I was afraid and backed away. And he -- but he removed the screen. And his -- his palm print, he tried to push that window up and open, but it has a screw. [¶] As to the two windows in the front of the house, one of

5

which is the living room and one of which is the dining room, I did not physically see him manipulate the windows, but I heard him making noise at them attempting to open them." She clarified that she did see defendant at the kitchen window and she backed away, afraid. Asked if she ever made eye contact with defendant, S.F. replied, "I don't believe he ever knew I was there."

S.F. testified she did not see anyone else with defendant when she first saw him. Nor did she see anyone in her backyard with defendant. Defendant was alone.

Approximately 11 minutes elapsed between when S.F. first called 911 and when police arrived. Sacramento Police Department Officer Steven Halverson was among the officers who responded to S.F.'s house at approximately 6:45 a.m. When Halverson approached the house, S.F. reported that defendant was still in the backyard. Halverson and other officers proceeded through the broken and splintered gate into the backyard. Halverson saw defendant standing on a patio in the backyard. Halverson arrested defendant.

After he placed defendant in his patrol vehicle, Halverson did a walkthrough with S.F. Halverson characterized S.F. as "scared or nervous."

S.F. inspected the wooden gate. The wood was splintered, there was a piece of wood on the ground, and the latch was broken away from the wood fence.

S.F. also found a jagged-edged knife with a wooden handle in the backyard "at the base of the door." According to Halverson, the knife, a 12-inch sheetrock knife, was in the location where he first saw defendant. S.F. testified that she would have noticed the knife had it been there the night before. She testified, "several hours earlier when I had taken the dog out, I came through this door and there was nothing there. [¶] Once the defendant had been arrested, there was a knife at the base of that door." S.F. testified that, as far as she knew, the knife did not belong to her. S.F.'s landlord testified he did not keep any knives or saws in storage in the casita.

6

S.F. pointed out to Halverson a kitchen window where she had seen defendant. Halverson saw the screen had been removed. The screen was on the ground a few feet away. The screen had been bent to be removed from the kitchen window. S.F. testified she never experienced trouble with the screens falling off.

Asked if she knew when or how the screen from the kitchen window was removed, S.F. testified: "It had to have been removed by the defendant that morning, because it was not like that when I took the dog out earlier." Thus, according to S.F., the screen must have been removed at some time after 2:00 a.m.

Halverson also saw what appeared to be a hand mark on the kitchen window, a "smudge from someone that attempted to push the window open." Police did not call for a CSI team because Halverson's training officer indicated that "latent prints would not be obtainable because of the smudge mark on them."

S.F. observed some baseball cards in a Home Depot bucket as well as a ball and other loose items defendant had taken from the bathroom side of the casita. S.F. testified that none of the loose items belonged to her. She testified the orange bucket had been taken from the bathroom area of the casita. She also testified more than once that the Home Depot bucket did belong to her. S.F.'s landlord testified he did not keep anything in storage in the bathroom portion of the casita other than a gas stove. He did not have a Home Depot bucket in the bathroom, although he may have had such items in the storage portion of the casita. Shown a photograph of various items and a Home Depot bucket, S.F.'s landlord testified that the items were not his.

After police left, S.F. found another piece of screen that had been removed. She found it "in the back. In the grass near where the casita is." This was from the screen on the window on the garage entry door.

The defense presented no evidence.

7

<u>Verdict</u> <u>and</u> <u>Sentence</u>

The jury found defendant guilty on count one, first degree residential burglary. (§ 459.) The jury also found true the allegation that, during the commission of the offense, another person, other than an accomplice, was present in the residence within the meaning of section 667.5, subdivision (c)(21). The trial court sentenced defendant to the midterm of four years.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant asserts the evidence was legally insufficient to support his conviction of first degree residential burglary. His challenges to the sufficiency of the evidence relate solely to the window screens. Defendant acknowledges that penetration into an area behind a window screen amounts to entry of a building within the meaning of the burglary statute. However, according to defendant, the conclusion that he penetrated the window screen was wholly speculative. Defendant asserts that the evidence that he cut or removed a window screen was "wholly circumstantial." Defendant emphasizes S.F.'s 911 call, during which she narrated his activities. Defendant maintains that, with S.F. focused on him "for almost the entirety of the incident, it is unreasonable that she missed [defendant] cutting and discarding the screen behind the casita all while using the knife that was found in her backyard." According to defendant, the evidence "supports a strong possibility that another person cut into the screen between the hours of 2:00 a.m. and the time [S.F.] saw [defendant] in her backyard."

Expanding on this third-party theory, defendant asserts: "[g]iven [defendant] was trying to get into every window, he reasonably avoided two step processes; explaining why [S.F.] found [defendant] attempting to slide open the window with the screen already cut into."

8

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).)

"The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence . . . ." (*People v. Maury* (2003) 30 Cal.4th 342, 396 (*Maury*).) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*Maury*, at p. 396; see also *People v. Bloom* (1989) 48 Cal.3d 1194, 1208 (*Bloom*) ["Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction"].)

" 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

"Every person who enters any house . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.) Thus, the "elements of first degree burglary in California are (1) entry into a structure currently being used for dwelling

9

purposes and (2) with the intent to commit a theft or a felony." (*People v. Sample* (2011) 200 Cal.App.4th 1253, 1261 (*Sample*), citing §§ 459, 460 & *People v. Anderson* (2009) 47 Cal.4th 92, 101.) "[P]enetration into the area behind a window screen amounts to an entry of a building within the meaning of the burglary statute even when the window itself is closed and is not penetrated." (*People v. Valencia* (2002) 28 Cal.4th 1, 13, fn. omitted (*Valencia*), disapproved on another ground in *People v. Yarbrough* (2012) 54 Cal.4th 889, 894.)

Here, at approximately 2:00 a.m., S.F. took her dog outside in her backyard. She noticed nothing unusual. With regard to whether she observed the house's windows at this time, she testified that everything appeared to be intact. "In other words, the screens were still on the windows. The windows were still closed." According to S.F., "it would have been blatantly obvious if they weren't" intact.

Approximately four and a half hours later, S.F.'s dog woke her up. S.F. heard someone manipulating the iron security door at the front of the house. She looked out the peephole and saw defendant on her porch "going back and forth, looking in the windows." Defendant then broke through the wooden gate to the side and went into the backyard. S.F. called 911.

Over much of the next nine minutes, S.F. observed defendant moving in and around the casita and from window to window of the main house trying to get in. S.F. narrated some of what she saw for the 911 operator.

Anxious and growing impatient waiting for police to arrive, at some point, S.F. abandoned the master bedroom window, where she had been watching defendant in the backyard, and went to the front of the house to see if police had arrived. At the latest, by five minutes 17 seconds into her 911 call, S.F. was at the front of the house. It was not until seven minutes into the 911 call, at least one minute 43 seconds after she left the master bedroom window to go to the front of the house, that S.F. returned and, shocked, found defendant on the other side of her kitchen window.

10

While S.F. did not actually see defendant remove any screens, she could see that the screen had been removed from the kitchen window. She could also see him sliding the window on the garage entry door, which he could not have done unless at least part of that screen had been removed.

Defendant continued "going back and forth, trying to find some way to enter." S.F. observed defendant trying to get into the house through at least three windows.

S.F. never saw anyone else with defendant. Defendant was alone.

After police arrived and arrested defendant, S.F. found a jagged-edged, wooden-handled knife on the ground. According to Officer Halverson, the sheetrock knife was in the location where he first saw defendant. The knife had not been there when S.F. took her dog out several hours earlier. S.F. testified that, as far as she knew, the knife did not belong to her. S.F.'s landlord did not keep any knives or saws in storage in the casita.

Halverson and S.F. found a window screen that had been removed. The screen had been bent to be removed from the kitchen window. After police left, S.F. found another piece of screen that had been cut from the window on the garage entry door.

The foregoing is substantial evidence sufficient to support the jury's verdict. It establishes that defendant was attempting to enter S.F.'s house over approximately 11 minutes, representing the time from when S.F. was awakened to when police arrived.

Taking the elements in reverse order, the jurors could reasonably infer defendant's "intent to commit a theft or a felony" (*Sample, supra*, 200 Cal.App.4th at p. 1261) from the foregoing circumstances of defendant persistently trying to enter into the occupied house over the course of 11 minutes (see *Bloom, supra*, 48 Cal.3d at p. 1208 ["Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction"]). By even greater force of reason, defendant's actions in taking items from the bathroom of the casita demonstrated that intent.

11

As for entry into the structure, as stated *ante*, "penetration into the area behind a window screen amounts to an entry of a building within the meaning of the burglary statute even when the window itself is closed and is not penetrated." (*Valencia, supra*, 28 Cal.4th at p. 13, fn. omitted.) Further distilling the evidence on this point, according to S.F., everything was normal and the windows and screens were intact as of 2:00 a.m. Four and a half hours later, defendant was attempting to enter the house through several windows. S.F. did not see him cut or remove the screens, but she saw him attempt to move the windows. Following defendant's apprehension, S.F. and Halverson found the screen from the kitchen window defendant was attempting to enter, which had been bent to be removed. S.F. later found a part of the screen which had been cut away from the window on the garage entry door, where defendant had also been trying to enter. S.F. found a sheetrock knife in the area where, according to Halverson, he first saw defendant. The foregoing was more than substantial evidence from which the jurors could reasonably infer defendant cut and removed screens to enter the house.

Defendant asserts that, with S.F. focused on defendant "for almost the entirety of the incident, it is unreasonable that she missed [defendant] cutting and discarding the screen behind the casita all while using the knife that was found in her backyard." This mischaracterizes the evidence. S.F. went to the front of the house as defendant was in the area of the casita and in her backyard. At five minutes 17 seconds into the 911 call, S.F. reported: "Yeah, I'm not watching him in the back of the house anymore, I'm at the front of my house." She did not return to the kitchen window, and see defendant on the other side of it, until one minute 43 seconds later, 7:00 minutes into the 911 call. This was ample time for defendant to remove one screen and cut another.

Defendant also maintains that S.F. "memorialized everything she witnessed to the 911 operator while [defendant] was in her backyard." This, too, mischaracterizes the evidence. There were long pauses on the call, during which S.F. was not narrating

whatever she was witnessing. Additionally, it is implausible to suggest that she conveyed to the 911 operator literally everything she observed.

In both his legal sufficiency argument and his jury instruction argument (see part II, *post*), defendant makes a point of characterizing the evidence that he cut or removed the screens as circumstantial, seeming to suggest its circumstantial quality renders it insufficient. The evidence he cut and removed the screens was indeed circumstantial; S.F. did not personally observe defendant cutting or removing the screens. However, with regard to our review for substantial evidence, "[t]he same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence . . . ." (*Maury, supra*, 30 Cal.4th at p. 396.)

We disagree with defendant's contention that the evidence before the jury was only sufficient to raise a suspicion it was defendant who removed screens. (See generally *People v. Draper* (1945) 69 Cal.App.2d 781, 786 ["evidence that merely raises suspicion, no matter how strong, of the guilt of a person charged with a crime is not sufficient to sustain a verdict and judgment against him"].) Viewing the record in a light most favorable to the judgment, as we must, we conclude that the evidence marshalled *ante* was more than sufficient to permit the jurors to infer defendant removed the screens. (See *Jennings, supra*, 50 Cal.4th at pp. 638-639.)

Based on the trial evidence, defendant's somewhat fanciful contention that a third party must have been in S.F.'s backyard between 2:00 and 6:30, cut and removed the screens, and departed, undetected by S.F. or her dog, is neither plausible nor supported by any evidence in the record. In asserting "the evidence also supports a strong possibility that another person cut into the screen between the hours of 2:00 a.m. and the time [S.F.] saw [defendant] in her backyard," defendant cites to one page of the trial transcript. However, of relevance on that page, S.F. only testified that the kitchen window screen must "have been removed by the defendant that morning, because it was not like that when I took the dog out earlier," and that the screen was removed "[s]ometime after

13

approximately 2:00 a.m." This does not constitute evidence "support[ing] a strong possibility that" a third party removed the screen.

The trial court instructed the jury with CALCRIM No. 224 as follows: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." Defense counsel emphasized this instruction in his closing argument. "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

The jury necessarily determined defendant removed the screens and that this was the only reasonable conclusion to be drawn from the circumstantial evidence. On appeal, "[w]e neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings, supra*, 50 Cal.4th at pp. 638-639.)

Based on the evidence before the jury, we cannot say " ' " 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.)

14

## II

*Failure to Instruct on Lesser Included Offense of Attempted Residential Burglary*

In the alternative to his first argument, defendant asserts the trial court erred in failing to instruct, sua sponte, on the lesser included offense of attempted residential burglary. Defendant asserts that, had he not removed the screen, "his offense would have constituted only attempted residential burglary because he never entered" the premises. He reprises his contention that the evidence he removed the screens was "wholly circumstantial." Defendant asserts the instruction on the lesser included offense of attempt should have been given sua sponte notwithstanding the fact that defense counsel stated he was not asking that the jury be instructed on the lesser included offense.

Before jury trial commenced, the trial court asked the attorneys, "Is anybody going to ask for a lesser, or is this all or nothing?" The prosecutor responded, "I am not asking for a lesser, but there may be a need for an attempt, depending on how the evidence comes out." Defense counsel stated, "I'm not going to make the request. I think it depends on how the evidence comes out, but at this time I think it is more of an all-or-nothing type case." At the jury instruction conference following the close of all evidence, defense counsel again confirmed he was "not asking for a lesser."

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial

15

tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155 (*Breverman*).)

The trial court is required to instruct on a lesser included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman*, *supra*, 19 Cal.4th at p. 162.) However, the court is not required to instruct on theories that are not supported by such substantial evidence. (*Ibid*.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*Ibid*.) " ' "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' " (*People v. Romero* (2008) 44 Cal.4th 386, 403 (*Romero*), quoting *Breverman*, at p. 162.)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.)

We disagree with defendant's contention that substantial evidence supported the conclusion that someone else cut and removed the screens and that the instruction on attempt was therefore required. Circumstantial evidence supported the conclusion that defendant cut and removed the screens. The screens were intact at 2:00 a.m. Defendant attempted to break into S.F.'s house at 6:30 a.m. He attempted to open the windows where screens were ultimately found to be missing. A jagged sheetrock knife was found where police encountered defendant. No one else was seen in the backyard that morning.

Conversely, we find no evidence in the record whatsoever to support the premise that the screens were already removed before defendant's arrival at S.F.'s house. On this record, such a conclusion would amount to pure speculation.

16

Defendant insists there was "plenty of evidence that [he] took advantage of the screen being already cut out of the window." However, he does not identify any such evidence, except that defendant cites to one page of the reporter's transcript to support his contention. That page contains S.F.'s testimony to the effect that she "didn't actually see him cut this screen off, but it became evident," she "didn't see him cut it. I saw him open the window," and related testimony. What does not appear on this page, however, is evidence supporting the premise that someone had previously removed the screens and that defendant took advantage of that fact. The fact that S.F. did not see defendant cut and remove the screens does not amount to evidence that someone else did so. Otherwise, defendant does not specifically identify any evidence constituting substantial evidence that an unknown third party went into S.F.'s backyard between 2:00 a.m. and 6:30 a.m., cut and removed two screens, did so undetected by S.F. and her dog, and then simply left.

Defendant also maintains that, "just as [the Attorney General] argues that it was unreasonable that someone cut through the screen of the window between a four hour window undetected by [S.F.] and her dog in the middle of the night, it was just as unreasonable that in under two minutes, [defendant] cut the screen and discarded part of it near the casita, all of which [S.F.] failed to see while capturing the events on the 911 call." (Fn. omitted.) We do not agree. The evidence establishes a period during the 911 call of at least one minute 43 seconds during which S.F. was at the front of the house and not watching defendant. This was more than sufficient time for defendant, the only person seen in S.F.'s backyard that morning, to cut and remove two screens and discard them without being noticed. Moreover, while defendant asserts there "was clearly room for reasonable doubt as to whether it was [defendant] who cut through the screen," that is not the question to be addressed on defendant's failure-to-instruct claim. The question is whether sufficient substantial evidence supported the instruction defendant asserts should have been given. We have concluded it did not.

17

Defendant also raises the fact that, in closing, defense counsel argued that S.F. was lying in her testimony. However, on appeal, "[w]e neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*Jennings, supra*, 50 Cal.4th at pp. 638-639.)

In short, we find no evidentiary support, let alone substantial evidence, for defendant's theory that someone else cut and removed the screens and that defendant merely attempted to enter S.F.'s house where those screens had already been removed. The trial court was not required to instruct on theories, such as defendant's, that did not find substantial support in the evidence. (*Breverman, supra*, 19 Cal.4th at p. 162.) Accordingly, the trial court did not err in failing to instruct the jury, sua sponte, on the lesser included offense of attempted residential burglary.

III

*Fines and Fees*

At sentencing, the trial court imposed a $1,200 restitution fine (§ 1202.4, subd. (b)) and a $1,200 suspended parole revocation fine (§ 1202.45), a $40 court operations assessment (§ 1465.8), a $30 conviction assessment (Gov. Code, § 70373), and a $10 Crime Prevention Program fine (§ 1202.5), and ordered victim restitution in an amount to be determined. Finding defendant indigent, the court waived the main jail booking fee and the main jail classification fee. The court also imposed a state surcharge assessment pursuant to section 1465.7, subdivision (a).

Relying on *Dueñas, supra*, 30 Cal.App.5th 1175, defendant asserts the trial court violated his due process rights by imposing fines and fees without conducting a hearing to determine his ability to pay. Defendant asserts we must remand the matter for the trial court to conduct an ability-to-pay hearing. Defendant also asserts the imposition of fines and fees absent an ability-to-pay determination amounts to the imposition of excessive

18

fines in violation of the Eighth Amendment and article I, section 17, of the California Constitution.

The Court of Appeal, Second Appellate District, Division Seven, filed *Dueñas* on January 8, 2019.  The trial court sentenced defendant here approximately one month earlier. Thus, defendant at sentencing could not have objected pursuant to *Dueñas*.  However, the Attorney General asserts defendant forfeited his claims because he never raised any due process objection or inability to pay claim in the trial court.  Defendant asserts his claims are cognizable on appeal notwithstanding the fact that he did not object at sentencing for a number of reasons we need not enumerate here.  We need not decide the forfeiture issue because we hold that *Dueñas* was wrongly decided regarding the issue of hearings on the ability to pay fines and fees before they are ordered by the trial court.

Defendant's claims hinge on the *Dueñas* analysis finding due process principles require an ability-to-pay hearing before imposing fines and fees.  We are not persuaded this analysis is correct.  Our Supreme Court is now poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*), review granted November 13, 2019, S257844, which agreed with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability-to-pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under section 1465.8 and Government Code section 70373, but not restitution fines under section 1202.4.  (*Kopp*, at pp. 95-96, review granted.)

In the meantime, we join several other courts in concluding that the principles of due process do not require determination of a defendant's present ability to pay before imposing the fines and fees at issue in *Dueñas* and in this proceeding.  (*People v. Cota* (2020) 45 Cal.App.5th 786, 794-795; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069 (*Aviles*); *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.)  To the extent defendant properly raises it, we conclude

19

his claim that his right to equal protection was violated by the imposition of fines, fees, and assessments without conducting an ability-to-pay determination also lacks merit. (*Aviles*, at pp. 1068-1069.)

Nor has defendant persuaded us that imposition of the fines, fees, and assessments violated his Eighth Amendment right against excessive fines as that right was recently discussed by the United States Supreme Court in *Timbs v. Indiana* (2019) __ U.S. __ [203 L.Ed.2d 11], on which defendant relies. Defendant has cited us to no authority, nor have we discovered any on our own, to establish the fines, fees, and assessments imposed in this case are excessive based on " '(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay.' " (*Aviles, supra*, 39 Cal.App.5th at p. 1070, quoting *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728; see *United States v. Bajakajian* (1998) 524 U.S. 321, 334 [141 L.Ed.2d 314].)

DISPOSITION

The judgment is affirmed.

_____
HULL, Acting P. J.

We concur:


_____
HOCH, J.



_____
KRAUSE, J.

20